936 F.2d 1433
 60 USLW 2033
 Ime Archibong ETUK; Jana Khalifa; Nuris Santana; Pedro
Julio Henriquez; Franklyn Thomas Dunbar, on
behalf of themselves and all others
similarly situated, Plaintiffs-Appellees,
v.
William S. SLATTERY, Acting Director of New York District
Office of the Immigration and Naturalization Service; Gene
McNary, Acting Commissioner of the Immigration and
Naturalization Service; Richard L. Thornburgh, Attorney
General of the United States; Immigration and
Naturalization Service, Defendants-Appellants.
 No. 1289, Docket 91-6008.
 United States Court of Appeals,
Second Circuit.
 Argued March 18, 1991.
Decided June 27, 1991.
 
 Charles S. Kleinberg, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Scott A. Dunn, Sp. Asst. U.S. Atty., Robert L. Begleiter, Deborah B. Zwany, Asst. U.S. Attys., E.D.N.Y., Brooklyn, N.Y., of counsel), for defendants-appellants.
 Manuel D. Vargas, The Legal Aid Soc., New York City (Kathleen A. Masters, Constance P. Carden, Margaret H. McDowell, The Legal Aid Soc., New York City, of counsel), for plaintiffs-appellees.
 Ann A. Ruben, Philadelphia, Pa., for amicus curiae American Immigration Lawyers Ass'n.
 Before MESKILL, MINER and ALTIMARI, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Eastern District of New York, Nickerson, J., entered on December 4, 1990, certifying a plaintiff class, declaring certain policies of the defendants, the Immigration and Naturalization Service, and certain of its officials (collectively "INS"), contrary to law, issuing a permanent injunction and denying the INS's application for a stay pending appeal. The district court's order implemented the findings and conclusions that it previously had reached in a Memorandum and Order dated September 27, 1990. See Etuk v. Blackman, 748 F.Supp. 990 (E.D.N.Y.1990). In that opinion, the district court granted in part the plaintiffs' motions for class certification and summary judgment against the INS and denied the INS's motion for summary judgment.
 
 
 2
 The district court concluded that the INS was legally obligated to ensure that lawful permanent resident aliens (LPRs) are provided with adequate temporary documentation of their LPR status and employment eligibility if their permanent documentation is lost, stolen, or confiscated pending the completion of deportation proceedings. Appealing from the district court's December 1990 order, the INS necessarily challenges the district court's findings and conclusions of September 27, 1990. Assuming familiarity with the district court's opinion, we limit our discussion of the factual background.
 
 
 3
 We affirm in part, vacate in part, and modify in part the district court's December 4, 1990, Order and remand the case for further action consistent with our opinion.
 
 BACKGROUND
 
 4
 The Immigration and Nationality Act (INA), 8 U.S.C. Sec. 1101 et seq.,[1] established a complex statutory scheme that governs the admission of aliens to the United States. Plaintiffs represent a class of individuals who have been granted LPR status by the INS. LPR status is afforded to certain aliens who are permitted to reside in the United States permanently as immigrants. 8 U.S.C. Sec. 1101(a)(20). The INA imposes certain limitations on the number of aliens who are eligible to receive LPR status. 8 U.S.C. Sec. 1151(a). Aliens who are eligible for LPR status fall within three general categories: (1) those with close relatives who are U.S. citizens or LPRs, see 8 U.S.C. Sec. 1153(a), (2) those who possess skills or talents that are sought by U.S. employers, see id., and (3) those who are refugees or asylees, see generally 8 U.S.C. Secs. 1157, 1158, 1159. Additionally, those aliens who fall within the first two categories must possess a valid immigrant visa and state whether they intend to remain permanently in the United States in order to qualify for LPR status. See 8 U.S.C. Secs. 1181, 1201, 1202(a); see also Saxbe v. Bustos, 419 U.S. 65, 72, 95 S.Ct. 272, 277-78, 42 L.Ed.2d 231 (1974).
 
 
 5
 LPRs must register with the INS and provide certain personal information and their fingerprints. 8 U.S.C. Sec. 1302. Once registered the INA mandates that these aliens "shall be issued a certificate of alien registration or an alien registration receipt card" in accordance with regulations prescribed by the Attorney General. 8 U.S.C. Sec. 1304(d); see also 8 C.F.R. Sec. 264.1 et seq. (regulations for fingerprinting and registration of aliens in the United States). The INS regulations provide for the issuance of either of two registration forms to LPRs--the Form I-151 or Form I-551. Form I-151 registration cards were issued to LPRs prior to June 1987. Since that time, LPRs have been issued the I-551 form. Both of these forms provide LPRs with proof of their alien registration and legal status. The documents are popularly referred to as "green cards." Green cards issued prior to August 1, 1989 bear no expiration date, while cards since issued are valid for 10 years. After the 10 year period has expired, the holder must obtain a replacement. See Resident Alien Card I-551; New Version, 54 Fed.Reg. 47,586 (1989).
 
 
 6
 "Green cards" play a significant role in the day-to-day lives of LPRs. A LPR, who has attained the age of eighteen, is required by law to keep his green card with him at all times. Failure to do so is a criminal misdemeanor. 8 U.S.C. Sec. 1304(e). Congress increased the importance of the green card with its adoption of the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. No. 99-603, 1986 U.S.Code Cong. & Admin.News (100 Stat.) 3359 (codified at various sections throughout Title 8 of the United States Code). IRCA substantively amended several provisions of the INA. In large part, the IRCA amendments focused on the issue of alien employment within the domestic economy. While the IRCA amendments have become part of the INA, we distinguish between these two statutes throughout our discussion to ease the analysis and to emphasize the changes that IRCA wrought.
 
 
 7
 IRCA provides that green cards can be used as proof of LPR status in order to establish one's eligibility for a variety of government funded assistance programs. Specifically, eligibility for such programs as Aid to Families with Dependent Children, Medicaid, unemployment compensation, food stamps, and Title IV educational assistance can be established by presenting a green card. IRCA, Sec. 121(a)(1), 100 Stat. 3384-86 (amending Social Security Act, 42 U.S.C. Sec. 1320b-7); Sec. 121(a)(2), 100 Stat. 3386-88 (amending Housing and Community Development Act of 1980, 42 U.S.C. Sec. 1436(a)); Sec. 121(a)(3), 100 Stat. 3388-90 (amending Higher Education Act of 1965, 20 U.S.C. Sec. 1091); see also McNary v. Haitian Refugee Center, Inc., --- U.S. ----, 111 S.Ct. 888, 891 n. 3, 112 L.Ed.2d 1005 (1991). While not the exclusive means of providing proof of lawful immigrant status under these provisions, the green card is the most widely utilized and accepted means of proving LPR status.
 
 
 8
 IRCA enhanced the importance of the green card in one additional area--employment authorization. IRCA, Sec. 101(a), 100 Stat. 3360-74 (codified at 8 U.S.C. Secs. 1324a(a)-(n)). In section 101(a) of IRCA, Congress set out to preclude the employment of aliens who had neither obtained LPR status nor been granted special employment authorization by the Attorney General. 8 U.S.C. Secs. 1324a(a), 1324a(h)(3). Indeed, domestic employers are subject to both civil and criminal penalties if they knowingly hire an unauthorized alien or fail to comply with the verification process established by the statute. 8 U.S.C. Secs. 1324a(a), 1324a(e) & (f). IRCA's verification scheme requires that an employer attest that it has confirmed a prospective employee's identity and employment authorization by reviewing one or more statutorily designated documents. 8 U.S.C. Sec. 1324a(b). In adopting this elaborate verification scheme, Congress sought to stem the tide of undocumented aliens into the United States. McNary, 111 S.Ct. at 890.
 
 
 9
 Under IRCA, presentation of a green card is not the exclusive manner by which a LPR can establish eligibility to work. For instance, a prospective employee's identity and employment eligibility can also be established by presenting a combination of other documents. See 8 U.S.C. Sec. 1324a(b)(1)(C) & (D). However, possession of a green card is often a prerequisite for obtaining some of the other documents such as a driver's license or a social security card. These statutory and administrative provisions that govern LPR status provide the backdrop for the instant controversy.
 
 
 10
 Plaintiffs filed this class action complaint on October 3, 1989. The plaintiff class presently before us consists of two subclasses: (1) LPRs who have either lost or had their green cards stolen, and (2) LPRs who have had or may have their green cards confiscated by the INS as a result of the agency's decision to initiate deportation proceedings against them. These plaintiffs challenged the INS's policies regarding the replacement of green cards that have been lost or stolen and the confiscation or withholding of green cards from LPRs whom the INS has placed in deportation or exclusion proceedings.
 
 
 11
 Under existing INS policies, a LPR who has either lost or had his green card stolen must submit an application for a replacement card by using an INS Form I-90. See 8 C.F.R. Sec. 264.1(c)(2). The processing time for a replacement card can exceed three months. In the interim, LPRs are potentially left without documentary proof of their immigration status. However, INS operating instructions provide for the provision of temporary documentation if "such action is clearly warranted because of an emergency." See INS, Operations Instructions, 264.2. Specifically, the INS provides the Form I-94--Departure or Arrival Record--as temporary proof of status. Plaintiffs alleged such temporary documentation often was not provided and, if provided, the documentation was inadequate. Regarding the "lifting"--confiscation--of green cards from LPRs who have been placed in deportation, the plaintiffs alleged that since LPR status is maintained until a final deportation order has been issued, this practice denied them proof of their LPR status. Additionally, plaintiffs asserted that the INS did not provide any temporary proof of status to LPRs whose green cards had been lifted.
 
 
 12
 The plaintiffs advanced statutory, administrative and constitutional due process claims. Plaintiffs argued, inter alia, that the INS was statutorily obligated to ensure that LPRs are provided with clear and unambiguous proof of their legal status and employment eligibility in a timely fashion. The INS, while acknowledging the delays in replacing lost or stolen green cards, asserted that the replacement documentation it provides--the Form I-94 Departure or Arrival Record--is legally sufficient proof of LPR status.
 
 
 13
 In March 1990, after the commencement of this action, INS Commissioner Gene McNary issued a new policy memorandum [hereinafter "McNary Memorandum"] that permitted, under limited circumstances, the lifting of green cards from LPRs placed in deportation, but required the issuance of temporary interim documentation in such instances. While the INS conceded that its national policy permits District Offices "in the exercise of their discretion," to lift alien registration documentation from LPRs who have been placed in deportation, it asserted that the New York District Office, the office whose conduct is at issue here, had elected not to lift proof of alien registration from LPRs.
 
 
 14
 The district court issued its Memorandum and Order, Etuk, 748 F.Supp. 990, on September 27, 1990. As a threshold matter, the district court rejected the INS's claims of mootness. The district court held that the plaintiff class qualified for certification under Fed.R.Civ.P. 23(b)(2). Id. at 995. The district court also concluded that the applicable statutory scheme requires the INS to provide LPRs with temporary verification of LPR status and work authorization in the event that their green cards have been lost, stolen or confiscated. The court reasoned that this is essential given the employment verification requirements imposed by IRCA. Specifically, the court found that one of the replacement documents provided by the INS--"Temporary Form I-551" (Form I-94 Departure Record)--was insufficient and misleading because it suggested that LPRs were only authorized to stay in the United States for a limited period. The court further found that this often interfered with a LPR's ability to obtain employment. Id. at 997-99. Finally, the court determined that many LPRs seeking replacement documentation were experiencing delays of three months or more. Id. at 993. The district court concluded that such delays were excessive, contrary to INS regulations and interfered with a LPR's ability to obtain employment and government benefits. Id. at 999.
 
 
 15
 Regarding the INS's policy of confiscating green cards from LPRs who have been placed in deportation proceedings, the district court rejected the argument that this issue had been rendered moot by the New York District Office's asserted "no lift" policy. The court reasoned that the policy as stated in the McNary Memorandum offered little assurance that the alleged improper practices would not recommence once the litigation had come to a close. The court also concluded that if the INS chooses to "lift" a LPR's green card, adequate temporary documentation must be provided. Id. at 1000.
 
 
 16
 The district court, in rendering its decision, focused exclusively on plaintiffs' statutory claims. The court expressly reserved judgment on the issue of what, if any, relief was warranted regarding LPRs who are placed in exclusion proceedings and paroled into the United States. Id. at 1001. Thus, this question is not before us. Although the district court ruled in favor of the plaintiff class in its opinion dated September 27, 1990, the court delayed issuing a remedial order to permit the parties to file additional papers. Finally, we note that having reserved judgment on one of plaintiffs' claims the district court did not enter final judgment in the case. Nor did the district court order pursuant to Fed.R.Civ.P. 54(b) that final judgment be entered on any of the claims currently before us.
 
 
 17
 Consistent with its earlier opinion, the district court, on December 4, 1990, entered a remedial order granting the plaintiffs declaratory and injunctive relief. First, the district court certified the plaintiff class under Fed.R.Civ.P. 23(b)(2) and pursuant to Fed.R.Civ.P. 23(c)(3) the court described the members of the class. Second, the court granted in part plaintiffs' request for declaratory and injunctive relief. In particular, the district court declared that the applicable immigration laws and regulations required the INS to issue within 21 days of the date of application temporary proof of status to all LPRs who apply for replacements. Third, absent the provision of temporary replacement documentation, the district court enjoined the INS from confiscating the green cards of LPRs who are placed in deportation proceedings and not held in custody. Fourth, the court directed the INS either to return the green cards or to issue adequate temporary documents to those LPRs who had their cards confiscated pending the resolution of deportation proceedings. Finally, the district court denied the INS's application for a stay of its judgment and order.
 
 
 18
 On December 26, 1990, the INS filed a notice of appeal pursuant to 28 U.S.C. Sec. 1292(a)(1) and sought a stay of the district court's order from this Court. We granted the stay, Pratt, J., and the appeal was expedited.
 
 DISCUSSION
 A. Jurisdiction
 
 19
 There having been no final judgment entered in this case, the INS relies on Title 28, section 1292(a)(1) as a basis for appellate jurisdiction. That section permits an interlocutory appeal from injunctive orders. Plaintiffs submit that we are without jurisdiction to review the INS's challenge to that part of the district court's order that dealt with the sufficiency of the temporary documentation provided to LPRs. They contend that the court's actions in this area were not injunctive in nature and are, therefore, not appealable at this time. Plaintiffs concede that we can review that part of the district court's order that precludes the INS from confiscating green cards from LPRs who are placed in deportation proceedings. We do not find plaintiffs' contention to be persuasive.
 
 
 20
 Plaintiffs' argument stems from the manner in which the district court drafted its written order. The court divided its order into three sections: Class Certification, Declaratory Judgment and Injunction. The only issue addressed under the "Injunction" section was the INS's practice of confiscating green cards once deportation proceedings have been instituted against a LPR. The inadequacy of the temporary documentation that the INS provides to LPRs and the problems with the INS's process for replacing lost or stolen cards were addressed under the section heading "Declaratory Judgment." That section of the order provided in pertinent part:
 
 
 21
 4. Defendants shall provide adequate, temporary proof of status to all lawful permanent residents (a) who apply to replace lost permanent resident or temporary permanent resident cards.... Defendants shall provide a written explanation of reasons to any applicant whose request for a temporary card is denied....
 
 
 22
 5. Defendants shall provide temporary proof of permanent resident status containing no information that casts doubt on the bearer's status.... The document shall identify itself to employers as an acceptable substitute for the permanent resident card.... The court finds that the I-94 card with the words "Arrival Record" ... does not meet these requirements. Defendants shall submit to the court, within 15 days of this order, a proposal meeting these requirements.
 
 
 23
 Review of this language reveals the weakness of plaintiffs' argument. The portions of the district court's order that appear under the heading "Declaratory Judgment" plainly direct the INS to take certain steps and to overhaul the content of the temporary documentation that it issues to LPRs. The mere fact that the district court labelled these sections of its order "Declaratory Judgment" cannot defeat our jurisdiction. We must look to the substance of the district court's order, not just its form. 9 Moore's Federal Practice p 110.20, at 220 n. 24 (2d ed. 1991).
 
 
 24
 Here, the district court not only declared the INS's temporary documentation inadequate but also directed the INS to create new documents that would satisfy certain specifications. While the district court may not have expressed a final opinion on the adequacy of these new documents, the district court essentially has precluded the INS from continuing to issue some of its prior documentation forms. Notwithstanding the labels that the district court selected, we treat this section of the district court's order as an injunctive order. "Coercive relief that is sought by the plaintiff and granted by the court has been considered to be an injunction for the purposes of Sec. 1292(a)(1) if it is relief that ... could have been granted, in equity." Id. p 110.20, at 220. The district court's order relating to the adequacy of the temporary LPR documentation is, therefore, properly before us.
 
 B. Standing
 
 25
 The INS also advances a jurisdictional argument. It contends that the plaintiff class lacks standing to maintain this action. The central question regarding the standing doctrine is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)) (emphasis added in Warth, 422 U.S. 490, 95 S.Ct. 2197).
 
 
 26
 The Supreme Court has broadly defined the constitutional requirements that a litigant must satisfy to establish standing:
 
 
 27
 Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.
 
 
 28
 Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982) (internal quotations and citations omitted).
 
 
 29
 In addition to these constitutional requirements, the federal courts have adopted a set of prudential considerations. First, the plaintiff must be asserting "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499, 95 S.Ct. at 2205. Second, exercise of federal jurisdiction is not warranted when the harm asserted is a "generalized grievance" shared equally by all of a large class of citizens. Id. (citing Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 220, 94 S.Ct. 2925, 2931-32, 41 L.Ed.2d 706 (1974)).
 
 
 30
 The plaintiff class has satisfied the requirements for standing. Members of the class have alleged and demonstrated to the district court that the INS failed to provide them with proof of their LPR status despite repeated requests for such documentation. While some of these class members have received such documentation since the filing of this action, we must look to the facts and circumstances as they existed at the time this suit was initiated. We conclude that members of the class adequately have established the existence of an injury in fact. See Bordell v. General Elec. Co., 922 F.2d 1057, 1060 (2d Cir.1991).
 
 
 31
 To establish the existence of an injury in fact, a plaintiff must demonstrate "some 'threatened or actual injury resulting from the putatively illegal action.' " Id. (citations omitted). In our view, plaintiffs have satisfied this test. Plaintiffs have alleged that as a result of INS procedures they and others similarly situated either have been or will be denied adequate proof of their legal alien status and employment eligibility. Moreover, this asserted injury "fairly can be traced" to the INS's alleged improper conduct. Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-26, 48 L.Ed.2d 450 (1976). While perhaps not the sole cause, the alleged improper conduct of the INS plainly constituted a primary factor in the harm that plaintiffs contend they have suffered and will continue to suffer. Finally, the injury alleged is "likely to be redressed by a favorable decision." Id. at 38, 96 S.Ct. at 1924. Requiring the INS to provide adequate temporary documentation of lawful alien status and employment authorization to LPRs will to a large extent avoid repetition of the harm that plaintiffs allege they have suffered.
 
 
 32
 Plaintiffs assert that due to INS policies and the inadequacy of the INS's temporary documentation process they are either not being provided with evidence of their lawful alien status in a timely fashion or, if provided, the documentation is misleading. They maintain that these inadequacies create problems when they seek employment and the district court found this issue to be undisputed. Plainly, plaintiffs have standing to bring this action; as LPRs they are directly in the group that allegedly has been or will be adversely affected by the INS's policies and procedures.
 
 C. Mootness
 
 33
 Finally, we agree with the district court that plaintiffs' claims have not been rendered moot. The mootness doctrine, like standing, stems from Article III's "case or controversy" requirement. "[A] case becomes moot ' "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." ' " Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208-09, 63 L.Ed.2d 479 (1980) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950-51, 23 L.Ed.2d 491 (1969))); see also 6A Moore's Federal Practice p 57.13, at 57-123 & n. 11 (2d ed. 1991). While standing focuses on the status of the parties when an action is commenced, the mootness doctrine requires that the plaintiffs' claims remain alive throughout the course of the proceedings. 13A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Sec. 3533, at 211 (2d ed. 1984). The "case or controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." Lewis v. Continental Bank Corp., 494 U.S. 472, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). In assessing whether a case is moot, we must examine all the facts and circumstances. Where, as here, a class action is involved, the Supreme Court has indicated that a "flexible" approach to the mootness doctrine is warranted. Geraghty, 445 U.S. at 400, 100 S.Ct. at 1210-11. As the Supreme Court recently has reiterated, even when the class representatives' claims have been rendered moot, the claims of the unnamed members of the class may remain alive. County of Riverside v. McLaughlin, --- U.S. ----, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991). Moreover, the party seeking to have the case dismissed bears the burden of demonstrating mootness and that burden "is a heavy one." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citation omitted).
 
 
 34
 The INS asserts that the case is moot because members of the plaintiff class have obtained replacement documentation since the initiation of the suit and the policy announced in the McNary Memorandum regarding the lifting of green cards is now utilized in deportation proceedings. First, while some members of the class have received replacement documentation, nothing ensures that other members of the class will continue to receive adequate documentation in the future. See, e.g., Allende v. Shultz, 845 F.2d 1111, 1115 n. 7 (1st Cir.1988) (issuance of entry visa did not moot challenge to INS policy that led to a previous denial of visa). The continuing vitality of this claim becomes apparent when one considers that plaintiffs challenged the adequacy of the temporary replacement documentation provided by the INS. The mere fact that the INS has provided replacement green cards to some members of the class does not resolve the question whether the delays are excessive or whether the INS's temporary interim documentation is legally sufficient.
 
 
 35
 Second, the policy "clarification" announced in the McNary Memorandum did not render moot plaintiffs' claims regarding the confiscation of green cards from those placed in deportation proceedings. That memorandum was entitled "Disposition of Alien Registration Documentation after institution of deportation or exclusion proceedings" and provided in pertinent part:
 
 
 36
 Litigation over the disposition of Forms I-151 and I-551 once the holders have been placed in deportation ... proceedings has revealed a need for clarification of Service policy in this area. The instructions contained in this memorandum are effective upon receipt, and will be followed until appropriate regulations and operations instructions are published.
 
 DEPORTATION PROCEEDINGS
 
 37
 A lawful permanent resident alien in deportation proceedings is required to be registered under section 261 or 262 of the Immigration and Nationality Act, as amended, and to be in possession of evidence of such registration. Form I-151 or I-551 [green card] is the appropriate evidence of alien registration for lawful permanent residents in the United States. Accordingly, when an order to show cause is issued, and the recipient is the holder of Form I-151 or I-551 and is not detained or incarcerated, he or she shall be allowed to retain possession of evidence of alien registration. If the alien has no evidence of alien registration, Form I-90 shall be filed and processed, and the appropriate documentation will be issued by the office having jurisdiction.
 
 
 38
 ... If the district director, chief patrol agent or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the [green card ] will be lifted, and a temporary I-551 issued. In these cases, temporary Forms I-551 will be prepared in accordance with the guidance in O.I. 264.1,[2] and will be issued for a period sufficient to allow completion of the deportation proceedings, but in no case less than six months.
 
 
 39
 McNary Memorandum, Memorandum from Office of Commissioner to All District Directors (Mar. 14, 1990) (emphasis and footnote added).[3]
 
 
 40
 The stated policy on its face is only prospective in nature. The claims of those class members who already have had their green cards lifted are not resolved by this policy "clarification." Additionally, the adequacy of the temporary documentation that the INS provides to those placed in deportation proceedings but who are without evidence of alien registration or who have had their green cards lifted remains an unresolved issue. Thus, there are issues that remain alive despite this "clarification" in INS policy. Moreover, since all members of the plaintiff class are LPRs, the potential for future contacts with the INS is high. Absent some unambiguous assurance that the INS will not revert to its old policies, plaintiffs plainly have a continuing stake in the outcome of this litigation. See Lewis, 110 S.Ct. at 1255. It, therefore, cannot be said that there is "no reasonable expectation that the alleged violation will recur" nor can it be said that intervening events have "completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles, 440 U.S. at 631, 99 S.Ct. at 1383 (citations and internal quotations omitted). In light of all the circumstances, the obvious potential for recurrent injury, "together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).
 
 D. Standard of Review
 
 41
 Where, as here, an interlocutory appeal has been taken from the district court's issuance of a permanent injunction, we may consider the underlying "merits of the case, to the extent they relate to the propriety of granting ... injunctive relief." 11 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2962, at 629 (1973). "A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct, and appellate review of the terms of the injunction must focus upon whether there has been an abuse of that discretion." Spring Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 355 (2d Cir.1983) (internal citation omitted); see also 11 Federal Practice & Procedure Sec. 2962, at 633 ("trial court has considerable discretion in determining whether the situation requires the issuance of ... a permanent injunction"). While the INS concedes that these are the proper standards for evaluating the district court's decision, it urges us to consider the broad discretion that it has over alien and immigration matters.
 
 
 42
 The Attorney General has been charged with the responsibility for the administration and enforcement of the nation's laws relating to immigration and naturalization. 8 U.S.C. Sec. 1103. Accordingly, the Attorney General enjoys broad discretion in this area. The Attorney General has in turn delegated that authority and discretion to the Commissioner of the INS. 8 C.F.R. Sec. 2.1. While in general the Executive Branch is permitted to exercise broad discretion on immigration matters, Congress can impose limitations on the exercise of that discretion. INS v. Chadha, 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983); see also United States v. Frade, 709 F.2d 1387, 1402 (11th Cir.1983). In short, executive agencies cannot exceed the limits of their congressionally delegated authority. "[T]he Attorney General acts in his presumptively Art. II capacity when he administers the [INA].... That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review." Chadha, 462 U.S. at 953 n. 16, 103 S.Ct. at 2785 n. 16. While deference must be shown to the Executive's exercise of discretion, see Kleindienst v. Mandel, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585-86, 33 L.Ed.2d 683 (1972), it should come as no surprise that Executive action cannot be contrary to law. Moreover, the cases that establish the principle of substantial deference have involved questions concerning the admittance or exclusion of aliens who have never been lawfully admitted to the United States. See id. (exclusion of an unadmitted and nonresident alien); Bertrand v. Sava, 684 F.2d 204, 211 (2d Cir.1982) (decision not to parole unadmitted alien). Here, the plaintiff class consists of aliens who have been lawfully admitted to the United States. As LPRs, their legal status has been altered and their rights enhanced. While we think the Executive still enjoys discretion when dealing with these individuals, we believe that the exercise of that discretion is subject to more intense judicial scrutiny.
 
 
 43
 Here, the district court ruled that the INA, which provides for LPR status, and IRCA, which requires employers to verify employment authorization, taken in combination impose a duty on the INS to provide LPRs with documentation that accurately reflects their immigration status and eligibility to work. The fundamental question, therefore, is whether the INS procedures at issue in the instant case are contrary to the provisions of the INA and IRCA.
 
 
 44
 With these principles in mind, we now turn to the specifics of the district court's injunctive order.
 
 E. Plaintiffs' Claims
 
 45
 The plaintiff class advanced two specific challenges to the policies and practices of the INS before the district court. First, plaintiffs alleged that the INS failed to provide them in a timely manner with adequate proof of LPR status after their green cards were lost or stolen. Second, plaintiffs challenged the INS's practice of confiscating the green cards of LPRs who have had deportation proceedings instituted against them and contended that some proof of LPR status must be provided during the pendency of the deportation proceedings.
 
 
 46
 1. Replacement Documents for Lost/Stolen Green Cards
 
 
 47
 The district court concluded that the INS's policy regarding the replacement of lost/stolen green cards was in violation of the INA, IRCA and the regulations adopted thereunder. 748 F.Supp. at 998-99. The INS argues that the district court's holding is contrary to law because it is premised on the erroneous conclusion that documents that establish proof of LPR status must also demonstrate employment authorization. We disagree.
 
 
 48
 The district court's holding merely seeks to implement the requirements imposed by the INA and IRCA. The INA mandates that the Attorney General provide LPRs who register with proof of their legal status. 8 U.S.C. Sec. 1304(d). It also requires LPRs to carry such proof of status with them at all times, 8 U.S.C. Sec. 1304(e), and obligates LPRs to support themselves. 8 U.S.C. Sec. 1251(a)(1), (8); see Sec. 1182(a)(15). Additionally, under IRCA, those who have attained LPR status are considered per se authorized for employment within the United States. See 8 U.S.C. Sec. 1324a(h)(3); see also 8 U.S.C. Sec. 1324a(a)(1)(A). Section 1324a(b)(1)(B) of IRCA provides in pertinent part:
 
 
 49
 (B) Documents establishing both employment authorization and identity
 
 
 50
 A document described in this subparagraph is an individual's--
 
 
 51
 (i) United States passport;
 
 
 52
 (ii) certificate of United States citizenship;
 
 
 53
 (iii) certificate of naturalization;
 
 
 54
 (iv) unexpired foreign passport, if the passport has an appropriate unexpired endorsement of the Attorney General authorizing the individual's employment in the United States; or
 
 
 55
 (v) resident alien card or other alien registration card, if the card--
 
 
 56
 (I) contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and
 
 
 57
 (II) is evidence of authorization of employment in the United States.
 
 
 58
 8 U.S.C. Sec. 1324a(b)(1)(B) (emphasis added).
 
 
 59
 Under this provision of IRCA, a legally sufficient "alien registration card" or "resident alien card" must include a photograph or other identifying information that the Attorney General finds sufficient and that document must be evidence of authorization to work in the United States. 8 U.S.C. Sec. 1324a(b)(1)(B)(v). Thus, the plain language of IRCA contemplates that an alien's green card will serve both as proof of LPR status and as employment authorization.
 
 
 60
 LPRs are not required to obtain any other independent evidence of their authorization to work; the green card itself is sufficient. Id.; see also Social Security Number, Policy and General Procedures, RM 00203.155(C) ("All immigrants admitted for permanent residence are authorized to work."). INS regulations provide that employment authorization is "incident" to LPR status. Specifically, the regulation states that LPRs are one of the classes of aliens "authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission ... and specific employment authorization need not be requested." 8 C.F.R. Sec. 274a.12(a). Moreover, LPRs are the only aliens that are deemed to possess an unrestricted authorization for employment in the United States. If the Attorney General provides employment authorization to any other alien, the documentation must conspicuously state any restrictions or limitations that have been imposed with respect to the "period or type of employment or employer." 8 U.S.C. Sec. 1324a(h)(1). The district court appropriately examined these statutory provisions as a whole and did not view any one in isolation. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 1554-55, 95 L.Ed.2d 39 (1987) (when interpreting a statute a court must "look to the provisions of the whole law, and to its object and policy").
 
 
 61
 The district court concluded that these statutory provisions and their related regulations imposed a duty on the INS to provide LPRs with adequate temporary documentation that would reflect their LPR status and their unrestricted authorization to work in the United States. 748 F.Supp. at 999. The court directed its attention to the specific procedures and documents that the INS uses to provide LPRs who have lost their green cards with temporary proof of LPR status.
 
 
 62
 Under the INS practices subject to challenge, LPRs who apply for a replacement green card receive one of three possible forms of temporary proof of status--each one utilizes the INS's "Temporary I-551" stamp. The stamp used for "Temporary I-551" documentation reads as follows:
 
 
 63
 PROCESSED FOR I-551. TEMPORARY EVIDENCE OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE VALID UNTIL ____. EMPLOYMENT AUTHORIZED.
 
 
 64
 This stamp is placed (1) in an applicant's unexpired foreign passport, (2) on the front of an INS "Form I-94 Departure Record," or (3) on the front of an INS "Form I-94 Arrival Record." The district court expressed no doubt as to the sufficiency of the stamp when it is placed in a valid passport. Indeed, the court noted that a stamped passport satisfies IRCA's requirements for an alien registration card. See 748 F.Supp. at 996, 998; see also 8 U.S.C. Sec. 1324a(b)(1)(B)(iv). The passport contains a photo, the "Temporary I-551" stamp establishes that the individual has LPR status, and it also indicates that employment is authorized.
 
 
 65
 With respect to the "Form I-94 Departure Record," the district court found it quite misleading because of language that appears on its reverse side:
 
 
 66
 Warning A nonimmigrant who accepts unauthorized employment is subject to deportation.
 
 
 67
 Important--Retain this permit in your possession; you must surrender it when you leave the U.S. Failure to do so may delay your entry into the U.S. in the future.
 
 
 68
 You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from immigration authorities, is a violation of the law.
 
 
 69
 The district court correctly surmised that this language suggests that the bearer is not a LPR and that his employment authorization is temporally restricted. Such time restrictions on employment authorization are inconsistent with LPR status. As previously noted, LPR status in itself constitutes employment authorization. 8 U.S.C. Secs. 1324a(b)(1)(B)(v), 1324a(h)(3). Indeed, this language on the "Departure Record" is inconsistent with LPR status because it suggests that the carrier of such a document actually has some other alien status. We agree with the district court that this language is misleading and potentially damaging to a LPR's ability to secure employment as well as to his or her ability to prove LPR status.
 
 
 70
 The INS argues, however, that it bears no responsibility for the fact that employers will not honor legally sufficient documentation. We disagree. First, the INA and IRCA require that LPRs be provided with documentation of their rightful legal status. While the original purpose for requiring the registration of aliens was to aid the government in regulating and monitoring aliens, see United States v. Franklin, 188 F.2d 182, 187 (7th Cir.1951), we agree with the district court that IRCA reflects a congressional intent to broaden the purposes for which registration documentation is used. 748 F.Supp. at 997. Today, the registration card is much more than a monitoring device for the government. It serves to establish employment authorization and eligibility for government benefit programs. Second, the INS has established elaborate procedures to ensure employer compliance with IRCA. The INS cannot so easily "pass the buck." As the agency charged with administering the INA and IRCA, the INS has a duty and a responsibility to ensure that LPRs are afforded their legal rights. To blame the employers for what is essentially the product of the INS's own actions would be improper. Arguments of administrative discretion lose their persuasiveness when the plain language of the documentation that is furnished to LPRs incorrectly indicates that these individuals are "authorized to stay in the U.S. only until the date" that is written on the "Departure Record." Such limitations on authorization to remain in the United States plainly are inconsistent with LPR status. Not only is such documentation misleading, it is factually and legally inaccurate. Therefore, we affirm the district court's determination that the "Departure Record" as currently constituted fails to provide LPRs with adequate proof of their legal status.
 
 
 71
 The district court's December 4, 1990 Order, however, also found the "Form I-94 Arrival Record" to be inadequate temporary proof of LPR status and work authorization. We can find no basis in the district court's November 27, 1990 opinion or in its subsequent Order for this conclusion. The "Arrival Record" does not suffer from the same infirmity as the "Departure Record"--the "Arrival Record" has no misleading information printed on its reverse side. Moreover, in our view, the "Arrival Record" possesses the same attributes as a passport stamped with the "Temporary I-551" legend. The district court expressed no concern about the adequacy of a stamped passport. Indeed, in reference to the "Departure Record" (the form that has the inaccurate information printed on its reverse side), the district court stated:
 
 
 72
 The front of the I-94, when so stamped [with the Temporary I-551 legend], with a photograph obscuring the words "Departure Record", would satisfy the statutory requirements for an "alien registration card" or "resident alien card." 8 U.S.C. Sec. 1324a (b)(1)(B)(v). A concern for fraudulent green card applications is a rational basis for limiting the card's validity to the interim period while INS processes and verifies applications.
 
 
 73
 748 F.Supp. at 998 (emphasis added). Thus, the only insufficiency that the district court found with the "Departure Record" is the language that appeared on the back of the document. That language, however, as we have noted, does not appear on the "Arrival Record."
 
 
 74
 Given this inconsistency between the district court's Order and its underlying opinion, we are unable to discern the basis for its determination that the "Arrival Record" is legally inadequate proof of LPR status. While this inconsistency may be nothing more than the result of a clerical error, we cannot speculate on what the district court intended. Notwithstanding this one problem, we agree with the district court that the "Departure Record," as currently constituted, fails to provide LPRs with clear and unambiguous proof of their legal status and eligibility to work. The legal rights of LPRs cannot fall victim to the INS's concerns for administrative convenience. We recognize, however, that the INS has an equally important duty and obligation to ensure that only legal aliens are provided with proper documentation. Recognition of this responsibility counsels in favor of permitting the issuance of "temporary" documentation pending review of an applicant's request for a replacement green card. Accordingly, we affirm the district court's actions as they relate to the inadequacy of the "Departure Record." We vacate and remand for further consideration or clarification that part of the district court's Order that found the "Arrival Record" legally insufficient. On remand, the district court either can confirm our suspicion that a clerical mistake was made or explain in detail the basis for its decision.
 
 2. Confiscation of Cards
 
 75
 The second INS policy that the plaintiff class challenged below was the INS's practice of "lifting" or revoking green cards from those LPRs who have had deportation proceedings initiated against them. In its December 4, 1990 Order, the district court permanently enjoined the INS from confiscating, retaining or withholding green cards from LPRs who are placed in deportation proceedings and not held in detention. Additionally, the court ordered the INS to return any card in its custody to the rightful owner or to provide alternative temporary proof of LPR status. The INS reiterates the same objections that it voiced to the district court's conclusions regarding the provision of temporary documentation to those who have lost their green cards.
 
 
 76
 Turning to the merits of the INS's claims, our analysis of the legal sufficiency of the replacement documentation provided to those who have either lost or had their green cards stolen is equally applicable here. LPRs who are placed in deportation proceedings do not lose the status of lawful residents and its attendant benefits until a deportation hearing has been conducted, see 8 U.S.C. Sec. 1252(b), and a final deportation order issued. See, e.g., In re Gunaydin, 18 I & N Dec. 326 (BIA 1982), aff'd, 742 F.2d 776 (3d Cir.1984). That process, as the INS concedes, can take several months. To revoke a LPR's green card pending completion of the deportation process would severely undermine the integrity of the process itself and impose significant hardship on the alien involved. While the INS's authority to monitor aliens is extremely broad, the agency cannot completely interfere with a LPR's ability to earn a living and provide for himself or family during the pendency of deportation proceedings, absent a decision to hold that individual in custody. The McNary Memorandum recognizes this very principle.
 
 
 77
 In reaching this conclusion, we do not intend to undervalue the INS's legitimate concerns for ensuring the appearance at a deportation hearing of those who have had deportation proceedings instituted against them. Our decision does not interfere with the INS's ability to enforce the nation's immigration laws. Other procedures built into the deportation process can be utilized to protect against a particular individual's flight: (1) detention, (2) release on a bond, and (3) release on conditional parole. See 8 U.S.C. Sec. 1252(a)(1). These procedures adequately protect the legitimate interests of the INS without unnecessarily interfering with a LPR's legal status and eligibility to work.
 
 
 78
 Despite our general agreement with the district court's reasoning and analysis, we believe that the court's order regarding the provision of temporary documentation to those placed in deportation proceedings, yet not held in custody, requires minor modification. When confronted with individuals who lack evidence of their LPR status, the INS should be free to deny replacement documentation when it reasonably believes that the lack of such evidence was not the result of innocent circumstances or happenstance. This modification is consistent with the conditions imposed by paragraph four of the district court's order regarding the provision of replacement documentation to those who claim to have innocently lost their green cards. We see no reason why those LPRs who are subject to deportation proceedings should not be subject to the same standards as LPRs who are seeking replacement documentation.
 
 
 79
 Finally, the district court's injunction is narrowly crafted and does not place a tremendous burden on the INS. Here, the injunction is aimed at remedying the process of providing temporary proof of lawful status to LPRs. The injunction is framed to address only those concerns. Moreover, the order, once modified, will permit the INS to withhold documentation from any LPR if it has reason to believe that the person seeking such documentation is not, in fact, a lawful permanent resident or that his was not lost or stolen. The INS greatly exaggerates the impact of the district court's order. The actions that are directed are simple and we believe that they easily can be implemented.
 
 CONCLUSION
 
 80
 We agree with the district court that the INA and IRCA require the INS to provide LPRs seeking replacement green cards with temporary proof of their legal status and employment authorization. We also conclude that such documentation must be provided to those LPRs who are in deportation proceedings and for any reason--confiscation or loss--not in possession of a green card. We, however, on this record, cannot agree with the district court's conclusion that the "Arrival Record" stamped with the "Temporary I-551" legend is legally inadequate. Indeed, our review of the record leads us to the opposite conclusion. Accordingly, we vacate that aspect of the district court's December 4, 1990 Order and remand the issue to the district court for further consideration consistent with this opinion. Finally, we direct the district court on remand to modify consistent with our opinion that aspect of its Order regarding the provision of temporary documentation to LPRs who have been placed in deportation proceedings.
 
 
 
 [1]
 The INA has been amended several times since its initial passage. All statutory references in this opinion are to the INA as it appears in the 1988 version of the United States Code. Recently, Congress significantly amended the Immigration and Naturalization Act with its passage of the Immigration Act of 1990, Pub.L. No. 101-649, 1990 U.S.Code Cong. & Admin.News (104 Stat.) 4978. Pursuant to section 161 of the 1990 Act, the effective date of most of these amendments is October 1, 1991. Id. (104 Stat.) at 5008. The amendments, however, are not relevant to the issues underlying this appeal. All citations to INS regulations are to the 1990 version of the Code of Federal Regulations (CFR)
 
 
 [2]
 INS, Operating Instruction (O.I.) 264.2 provides for the issuance of temporary proof of LPR status that is the same type as the documentation that is issued to LPRs who are awaiting replacement cards
 
 
 [3]
 We note that the language of this memorandum essentially concedes some of the very issues that plaintiffs have sought to establish in this action--that LPRs must be provided with documentation of their LPR status and that possession of such documentation by LPRs is mandated by law. This severely undercuts one of the standing arguments that the INS has advanced before us. The INS argued that only those LPRs who were criminally prosecuted for failure to possess a green card had standing to challenge the INS's practices. The language of the McNary Memorandum reveals the weakness and untenable nature of that argument