certainty than we have here. I do not see the issue that is inextricably intertwined in the issues properly before us.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0361P (6th Cir.)
File Name: 02a0361p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

FARM LABOR ORGANIZING
COMMITTEE, et al.,
      *Plaintiffs-Appellees,*

    *v.*

OHIO STATE HIGHWAY
PATROL, et al.,
      *Defendants-Appellants.*

No. 00-3653

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 96-07580—James G. Carr, District Judge.

Argued: December 4, 2001

Decided and Filed: October 17, 2002

Before: KENNEDY, MOORE, and COLE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellants. Kimberly M. Skaggs,

EQUAL JUSTICE FOUNDATION, Columbus, Ohio, for Appellees. **ON BRIEF:** Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellants. Kimberly M. Skaggs, J. Mark Finnegan, EQUAL JUSTICE FOUNDATION, Columbus, Ohio, for Appellees.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined. KENNEDY, J. (pp. 42-52) delivered a separate dissenting opinion.

––––––––––––––

**OPINION**

––––––––––––––

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant, Trooper Kevin Kiefer, appeals the district court's denial of qualified immunity in this § 1983 action alleging that he (1) targeted the individual plaintiffs for questioning concerning their immigration status based solely upon their race or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment, and (2) unreasonably detained the plaintiffs' green cards for four days without probable clause in violation of the Fourth Amendment.[1] For the reasons stated below, we **AFFIRM** the denial of qualified immunity as to the plaintiffs' Fourth and Fourteenth Amendment claims. Furthermore, we **AFFIRM** the district court's grant of partial summary judgment to plaintiffs on the issue of Fourth Amendment liability and **REMAND** for further proceedings consistent with this opinion.

––––––––––––––––––––––

[1] In this opinion, we address only Trooper Kiefer's claims on appeal. Although the Notice of Appeal refers to "all Defendants," Joint Appendix ("J.A.") at 258, the Appellants' brief discusses only Trooper Kiefer's defense of qualified immunity. We therefore decline to consider any appellate issues relating to the other defendants in this action. *See Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) (explaining that issues not raised in briefs on appeal may be deemed waived).

Also, while the district court seems to accept the officer's testimony that plaintiffs told them they paid for the cards, plaintiffs have not abandoned their claim that they told him they had paid the necessary fees. (App. Br. 4) They maintain there was no reasonable suspicion justifying retention of the cards in light of that answer. If the jury believed they said "fees" or paid the fees, it could find there was no basis to retain the cards beyond the time taken for the drug investigation.[2]

In granting summary judgment to plaintiffs, the district court also held that Kiefer was required to give plaintiffs some kind of substitute card. I cannot agree that this requirement was clearly established or constitutionally required.

The court is granting summary judgment to both plaintiffs. The second officer, not defendant Kiefer, took the green card from Esparza. The record is unclear as to the relationship between defendant Kiefer and the second officer. They appear to have arrived in separate vehicles, but even this is unclear. While Kiefer retained Esparza's card, he was not the one who seized it.

In view of the factual issues, the uncertainty as to the parameters of the Fourth Amendment violation, the lack of briefing, the denial of the ability to raise the probable cause issue on appeal of summary judgment for plaintiffs, even though he clearly did not waive it, I do not believe we should decide plaintiffs' motion for summary judgment on the Fourth Amendment claim. It seems to me that affirming summary judgment for plaintiffs on our own initiative requires more

––––––––––––––––––––––

[2] It is unclear whether plaintiffs will be permitted to show that the officer was without basis to seize the green cards because they said they paid the fees -- not that they paid for the cards. Their damages may be different if there were no basis for seizing the cards. [Will defendant be precluded from arguing that the appearance of one of the cards made him question its validity? A fact he testified to in his deposition.]

explicitly either and has argued in his brief in chief that the cards could be seized as contraband, a status they could achieve only if there were probable cause for their seizure. It is patently unfair to grant summary judgment to plaintiffs without reviewing an issue they raised in the district court but may not have adequately raised on the limited appeal of a qualified immunity defense. In effect, the panel is requiring that defendants appealing on qualified immunity must appeal all possible issues and if defendants fail to appeal an issue, judgment may be entered against them and they will be foreclosed from presenting that issue at trial.

Third, neither we nor the district court have clearly defined the boundaries of the constitutional violation. Judge Moore's opinion concludes that at least the retention of the cards beyond some time on Monday, when their validity could have been checked, violated the Fourth Amendment. If the violation is controlled by *Place,* and there was no probable cause, it seems to me that retention of the green cards after finding no drugs and permitting plaintiffs to be on their way completed the constitutional violation. A green card seems as closely related and important to a traveler as luggage and the Supreme Court held in *Place* that a seizure of drugs based on reasonable suspicion could not be extended 90 minutes to wait for the drug dog. The district court appears to hold that the retention for verification "would only be permissible under the Fourth Amendment if Trooper Kiefer made clear to plaintiffs how he planned to reunite them and the green cards and if retention was no longer than absolutely necessary to verify the documents." (J.A. 210) While the Court in *Place* held that "the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." 402 U.S. 710, there is no suggestion that providing that information is constitutionally required or that, standing alone, the failure to give such information is a constitutional violation.

## I. BACKGROUND

### A. Factual Background

Plaintiffs Jose Aguilar and Irma Esparza ("plaintiffs") are lawfully admitted permanent resident aliens. On Sunday, March 26, 1995, Aguilar and Esparza were driving from their home in Chicago, Illinois, to Toledo, Ohio, to visit family members. During this trip, an Ohio State Highway Patrol ("OSHP") trooper, Kevin Kiefer, stopped Aguilar and Esparza for driving with a faulty headlight. After the plaintiffs pulled over, Trooper Kiefer approached the plaintiffs' car and asked to see Aguilar's driver's license. Aguilar provided Trooper Kiefer with a valid Illinois driver's license. Trooper Kiefer then ordered Aguilar out of the car and placed him in the back of his cruiser.

Almost immediately thereafter, a second OSHP cruiser arrived. A trooper from the second cruiser walked a drug-sniffing dog around the outside of the plaintiffs' vehicle. The dog "alerted," indicating that the vehicle contained narcotics.[2]

The second trooper then asked Esparza for identification. She offered the trooper an Illinois identification card, but the trooper reportedly grabbed her wallet and removed her green card. The trooper then instructed Esparza to step out of the vehicle. She was locked in the back of Trooper Kiefer's cruiser next to Aguilar. Trooper Kiefer then demanded to see Aguilar's green card. The green cards of both Aguilar and Esparza were valid and in force at the time of this encounter.

After examining the green cards, the troopers asked Aguilar and Esparza where they had obtained their green cards and whether they had paid for them. The troopers were attempting to inquire whether the documents were forged, since green cards are not offered for sale. Aguilar and

---

[2]It was later determined that the dog had alerted in error, and that neither of the plaintiffs were carrying drugs.

Esparza speak limited English, however, and believed that the troopers were asking whether they had paid the required processing fees. They responded that they had paid for the cards, meaning that they had paid all required fees. Trooper Kiefer interpreted the plaintiffs' response as an indication that the cards were likely forged, and retained the green cards for authentication.

Trooper Kiefer was unable to contact the INS to verify the authenticity of plaintiffs' green cards at the time of the encounter, because it was a Sunday, so he took the green cards and let the plaintiffs go. Trooper Kiefer "did not issue the plaintiffs a receipt for their green cards, tell them when they could expect them back if the cards were indeed authentic, or tell them where or how to inquire if they had any questions about the seizure." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723, 728 (N.D. Ohio 2000).

The next day (Monday), the plaintiffs retained an attorney. That day, paralegal Arturo Ortiz contacted the OSHP on behalf of Aguilar and Esparza, but was unable to obtain assistance because he lacked information regarding the incident. On Thursday, Ortiz again contacted OSHP and spoke to Trooper Kiefer. Kiefer returned the green cards personally that same day, four days after the initial seizure. When asked in his deposition why it took so long to verify the green cards, Trooper Kiefer explained that he had taken a few days off from work and was unable to reach the INS during that time.

The plaintiffs contend that Trooper Kiefer's actions were, in part, the product of a pattern and practice by the OSHP of questioning motorists about their immigration status on the basis of their Hispanic appearance. From the record, it appears that the OSHP — particularly its Traffic and Drug Interdiction Team (TDIT) — began taking a more active role in immigration enforcement in 1995. Pursuant to this role, OSHP troopers have been known to inquire into motorists'

If the cards were legally seized on this basis, the continued retention of the green cards does not constitute a separate Fourth Amendment seizure. *Fox v. Van Oosterum,* 176 F.3d 342 (6th Cir. 1999).[1]

If I am in error and there was no probable cause to seize the cards, then I agree that *United States v. Place*, 462 U.S. 696 (1983) was the controlling-established law and the cards were required to be returned after the search for drugs was completed.

Finally, I do not believe we should apply the doctrine of pendent appellate jurisdiction and affirm the grant of summary judgment to plaintiffs for at least three reasons. First, the parties have been given no opportunity to brief the issue. While plaintiffs asked that we review additional issues beyond defendant's qualified immunity, that motion was not granted.

Second, in granting summary judgment to plaintiffs, the court is foreclosing defendant Kiefer from appealing the issue of whether he had probable cause to seize the green cards. Judge Moore's opinion holds that in his brief on appeal Kiefer does not challenge the district court's ruling that he did not possess probable cause to seize the green cards and does not address the merits of that issue. Although Kiefer did not raise the issue specifically in his brief, he has not waived it

---

[1] As we stated in *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991), "probable cause is determined by an objective examination of all of the circumstances known to the officers. Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists." (citing *Florida v. Royer,* 460 U.S. 491, 507, 103, S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1982)).

Our court went on to hold that "knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants." *Id.* at 457

that plaintiffs said they "paid for the cards," I would hold he had probable cause to seize the cards. Even if Kiefer erred in concluding that probable cause existed to seize the cards, he would be entitled to qualified immunity because his conclusion was reasonable, if mistaken. *Hunter v. Bryant,* 502 U.S. 224, 228, 229 (1991); *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). The cards would be contraband under Ohio law since they would be forged if not lawfully issued to plaintiffs.

Possession of a writing known to be forged with the purpose to utter or uttering an identification card is a crime under Ohio law. CRC §§ 2901.01(m), 2913.32 and 2933.42. The green card is clearly an identification card. Kiefer knew that green cards are not legally bought and paid for. He had plaintiffs' admissions that their cards had been paid for. Clearly the cards were possessed with the intent to use them as identification. The cards were evidence of the suspected crime. They could easily be destroyed if not retained. As the district court recognized, Ohio State Highway Patrol troopers are entitled to seize forged documents. (J.A. 205)

As the Court stated in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535 (1983):

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

*Id.* at 742.

immigration status during routine traffic stops. When these inquiries lead an OSHP trooper to conclude that an individual may be an illegal immigrant, the trooper will contact the Border Patrol and detain the suspect until the Border Patrol arrives. Pursuant to this practice, "the OSHP has detained hundreds of motorists who were suspected to be illegally in the United States following routine traffic stops; such detention, in all likelihood, was precipitated by answers given to questions regarding the motorists' immigration status." *Farm Labor Org. Comm.*, 95 F. Supp. 2d at 735. Although the OSHP maintains that it does not do so frequently, troopers sometimes seize alien registration cards of suspected illegal immigrants and deliver them to federal authorities.

### B. Procedural History

This case was brought as a class action lawsuit. The plaintiff class (the "class") is composed of migrant workers who claim that the OSHP has violated their constitutional rights by interrogating them about their immigration status, and, in some cases, confiscating immigration documents, on the basis of their Hispanic appearance. The class's initial motion for a preliminary injunction to enjoin this practice was denied without prejudice, because none of the named plaintiffs had ever been stopped, and the class therefore lacked standing. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 991 F. Supp. 895, 899 (N.D. Ohio 1997). The class subsequently amended its complaint to add plaintiffs Jose Aguilar and Irma Esparza, who were stopped by the OSHP. The district court then granted in part the class's request for a preliminary injunction, ordering the OSHP to (1) refrain from questioning motorists about their immigration status absent consent or reasonable suspicion based upon articulable objective facts, (2) refrain from seizing immigration documents without "lawful cause for doing so," and (3) provide effective substitutes for any immigration documents seized. *Id.* at 907.

On August 17, 1998, the district court certified the class under Federal Rule of Civil Procedure 23(b)(2). *Farm Labor Org. Comm. v. Ohio State Highway Patrol*,184 F.R.D. 583 (N.D. Ohio 1998). On September 8, 1999, the district court issued an order granting summary judgment to all defendants, except Trooper Kevin Kiefer, on the class's Fourth Amendment claims. The court granted the motion of plaintiffs Aguilar and Esparza for summary judgment against Trooper Kiefer based upon the claim that Trooper Kiefer had unreasonably detained their green cards for four days after the March 26, 1995, stop. The court found that questioning regarding immigration status, however, did not offend the Fourth Amendment, so long as it took place pursuant to lawful traffic stops and the duration of these stops was not extended beyond the time required to complete the legitimate purposes of a traffic stop. The court found that the questioning of Aguilar and Esparza took place after the police had probable cause to perform a search for narcotics, based upon the alert of the drug detection dog. Consequently, the questioning of Aguilar and Esparza regarding their immigration status did not violate the Fourth Amendment. The district court also dissolved the preliminary injunction it issued on December 8, 1997.

The class subsequently moved for reconsideration of the September 8th order. The class asserted that the September 8th order failed to address a number of matters, including its motion for injunctive relief under Title VI, the status of class-wide claims for injunctive relief under the Fourth Amendment, and claims for relief under the Equal Protection Clause of the Fourteenth Amendment.

On April 20, 2000, the district court granted the motion for reconsideration in part and denied it in part. *Farm Labor Org. Comm.*, 95 F. Supp. 2d 723. The court found that the class lacked standing for class-wide injunctive relief, because the named plaintiffs had been stopped only once and the court did not find a sufficient likelihood that they would be subjected to similar practices again in the future. *Id.* at 730-

*Id.* at 813, it would be anomalous and a trap for the unwary to tell police officers they could arrest with probable cause without regard to motivation but they would be liable for damages for the same conduct under the equal protection clause unless they could prove to a jury they would have done the same without the discriminatory motive. There is no reason to believe that the Court would reject its holding that probable cause to believe the law has been broken "outbalances" private interest in avoiding police contact.

I must also respectfully dissent from the majority's disposition of plaintiffs' Fourth Amendment claim. I do not believe we have jurisdiction to decide defendant's appeal since there is a material fact in dispute. Defendant has not accepted for the purpose of this appeal plaintiffs' assertion that they told Kiefer they had paid all the necessary fees, rather than, as asserted by Kiefer, that they paid for their green cards. If the jury believed plaintiffs' testimony, no retention after the drug investigation ended was permissible because there would have been no basis for a reasoned suspicion that the cards were counterfeit, invalid, or illegally obtained and therefore contraband under Ohio law. Under *Johnson v. Jones*, 515 U.S. 304 (1995), the court of appeals may not review an interlocutory appeal on the grounds of qualified immunity where there are material issues of fact unresolved. I would dismiss the Fourth Amendment portion of the appeal for that reason.

We review defendant's motion for summary judgment *de novo*. In the district court, Kiefer argued that he had probable cause to seize the cards in view of the plaintiffs' admission that they had paid for the cards. The district court found only a reasonable suspicion to seize the cards. While defendant accepted the factual findings of the district court, probable cause is not a fact but a legal issue reviewed *de novo, Ornelas v. United States,* 517 U.S. 690 (1996), or at least a mixed question where the legal issues are reviewed *de novo* by the appellate court. Kiefer has continued to argue in his brief on appeal that he lawfully seized the cards. If we accept as fact

that the court will not examine whether the officer also had a discriminatory purpose.

In *Whren*, recognizing that the Court had been unwilling to entertain Fourth Amendment challenges based on individual motivation of officers, petitioners had sought a standard as to what a reasonable officer would have done under same circumstances. In rejecting that standard, the Court stated:

> the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent. *See*, *e.g.* [*United States v. Robinson,* 414 U.S. 218 (1973)].

*Whren*, 517 U.S. at 814.

Elsewhere in its opinion, the Court characterized *Robinson,* holding as follows:

> We described *Robinson* as having established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 436 U.S. at 136, 138, 98 S.Ct. at 1723.

*Id.* at 813 (quoting *Scott v. United States*, 436 U.S. 128 (1978)).

The Court found no need to do a balancing analysis except for cases conducted in an extraordinary manner, harmful to a person's privacy or physical interest. While the Court pointed out,

> But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

33 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). The court found that plaintiffs Aguilar and Esparza did have standing to sue for damages on an equal protection theory, however. *Id.* at 730. The district court then denied Trooper Kiefer's motion for summary judgment based upon qualified immunity, and granted Aguilar's and Esparza's motions for summary judgment against Trooper Kiefer on their equal protection claims. The court found that Aguilar and Esparza had presented sufficient evidence to make a prima facie case that Trooper Kiefer targeted them for investigation regarding their immigration status solely on the basis of their being Hispanic. *Id.* at 737. The court further concluded that Trooper Kiefer had failed to offer any legitimate race-neutral explanation for the investigation. *Id.* at 738. The court also denied summary judgment based upon qualified immunity to certain of Trooper Kiefer's superior officers in connection with Aguilar's and Esparza's claims against them in their individual capacities for deliberate indifference to Aguilar's and Esparza's constitutional rights. *Id.* at 741. Finally, the district court granted summary judgment to all defendants in connection with the class's Title VI claims, because the class failed to demonstrate a sufficient nexus between federal funds provided to the OSHP and the challenged activity. *Id.* at 743.

## II. ANALYSIS

### A. Jurisdiction

In *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), the Supreme Court held that denials of summary judgment on the basis of qualified immunity, to the extent that such orders turn on issues of law, are immediately appealable under the "collateral order" doctrine articulated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). Pursuant to this doctrine, federal appellate courts have jurisdiction to hear interlocutory appeals concerning "the legal question of qualified immunity, i.e., whether a given set of facts violates clearly established law." *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999). Conversely, denials of

qualified immunity may not be reviewed on interlocutory appeal insofar as "a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial." *Johnson v. Jones*, 515 U.S. 304, 314 (1995). For the purposes of this appeal, therefore, we assume the plaintiffs' version of the facts is true, and ask whether, given such facts, the plaintiffs have demonstrated that Trooper Kiefer violated their clearly established rights under the Fourth and Fourteenth Amendments.[3]

## B.  Standard of Review

We review de novo a district court's denial of summary judgment on qualified immunity grounds, because the determination of whether qualified immunity is applicable to an official's actions is a question of law. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Summary judgment is proper only when there is no dispute as to a

---

[3] The dissent argues that we do not have jurisdiction to consider defendant's appeal on the Fourth Amendment issue because Trooper Kiefer has not accepted plaintiffs' version of the facts. We disagree. In his brief, Trooper Kiefer clearly states that he "does not dispute the facts found by the District Court." Appellant's Br. at 5. Morever, even if the parties were not in agreement on the facts, we still would have jurisdiction to decide the legal question of qualified immunity — i.e., whether, assuming the plaintiffs' version of the facts to be true, the plaintiffs have shown a violation of their clearly established constitutional rights. *Johnson* merely establishes that we lack jurisdiction over "a portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." 515 U.S. at 313. For example, we would not have jurisdiction over Kiefer's appeal if his argument were merely that the plaintiffs cannot prove that he seized their green cards. Such an "[I] didn't do it" defense would present a *Johnson* problem. *Id.* at 316. Nevertheless, *Johnson* does not preclude our review of purely legal questions, such as whether a given set of facts alleged by the plaintiffs would demonstrate a constitutional violation.

---

same decision would have resulted even if the impermissible purpose had not been considered, relying on *Wyate* and *Armstrong*. The effect of the majority's holding would greatly diminish the protection of qualified immunity in equal protection claims. It would be a rare case involving a minority where plaintiff could not assert an issue of fact as to an officer's intent no matter how strong the non-discriminatory motive may be. I assume the majority would apply the same balancing to cases where there is probable cause as well as to the investigative stop we have here. The balancing would require officers engaged in an investigation to make, at their peril and at every step, a decision as to whether they would pursue their present course of investigation if they had no discriminatory motive. They may or may not be thinking of the discriminatory motive at the time. And keep in mind that it is not whether this officer would or would not act the same. To be prudent the officer must consider what a jury would be likely to conclude – and all this would need to be done on the spot – perhaps in seconds. The question of what plays a determinate role is not one easily decided.

Confronted by a related problem in *Whren v. United States*, 517 U.S. 806 (1996), where an officer engaged in law enforcement was alleged to have mixed motives in stopping a vehicle but had probable cause to do so, the Court held that if the officer had probable cause to stop the vehicle, the Court would not inquire whether the officer had another motive.

Although the court left open the question of whether *Whren's* holding would apply if challenged on equal protection grounds, it would be a trap for the unwary if the officer were subject to a suit for damages after he or she arrested someone with probable cause and a jury concluded the officer had not proved he would have made the arrest except for a discriminatory purpose. I believe there is the same need for the *Whren* analysis in equal protection claims, a holding that an officer may arrest with probable cause and

the arresting officers to notify the alien's consulate under the Vienna Convention on Consular Relations April 25, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.  Also OHSP policy #9-902.08 requires special steps where an alien is arrested. These requirements apply without regard to the race of the alien.  While there ordinarily may be no reason to inquire about immigration status in conjunction with a traffic stop, which ordinarily does not result in an arrest but rather a traffic citation, a broader inquiry is justified for a drug investigation which is likely to result in an arrest.  While some other officer is searching the vehicle, I would hold that an officer could further investigate the identity of the driver and passenger and the likelihood of their being from a nation that is a known drug source.  Nowhere is it clearly established that the officers must wait until they find the drugs before they may inquire further regarding suspects whose difficulty in speaking English suggests they may be aliens.  This is not a case where the police initiated the investigation based on race.

Whether *Travis* was correctly decided or whether it should continue to be followed, I believe it is sufficient to entitle Kiefer to qualified immunity in the action against him individually for damages.  I would, therefore, reverse the denial of qualified immunity on this issue.

A recurring problem in this appeal is that the district court wrote no separate opinion dealing with plaintiffs' claims against Kiefer individually.  The district court's opinions dealt with other defendants as well as with class claims.  Thus, in describing discriminatory conduct, neither the district court nor the majority limit their recitation of the facts to Kiefer's conduct with respect to plaintiffs.  Kiefer is not personally liable for another's conduct.  There is no claim he supervised other defendants. I am at a loss to understand how Kiefer's intent can be inferred from Sergeant Elling's or Trooper Pache's conduct or that of other OSHP officials.

In rejecting *Travis*, the majority would adopt a standard shifting to the defendant the burden of establishing that the

material question of fact and the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c).

According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity involves a two-step inquiry. First, the court considers whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156 (2001).  If the court finds a constitutional violation has been demonstrated, it must then consider whether the violation involved "'clearly established constitutional rights of which a reasonable person would have known.'"  *Dickerson*, 101 F.3d at 1158 (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)); *see also Saucier*, 121 S. Ct. at 2156.  For a right to be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in the light of pre-existing law the unlawfulness must be apparent.'"  *Id.* (quoting *Anderson*, 483 U.S. at 640).  As the Supreme Court has recently explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 122 S. Ct. 2508, 2516 (2002).  "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  *Id.*

## C.  Equal Protection

Plaintiffs allege that Trooper Kiefer violated their rights under the Equal Protection Clause of the Fourteenth Amendment by targeting them for investigation concerning immigration status and seizing their green cards because of their Hispanic appearance.  The district court found that the plaintiffs presented sufficient evidence to show that they were targeted for questioning about their immigration status solely because of their Hispanic appearance, and that the OSHP and Trooper Kiefer had failed to articulate a race-neutral reason for questioning the plaintiffs.  The court therefore denied Trooper Kiefer's motion for summary judgment based upon his defense of qualified immunity and granted partial summary judgment to the plaintiffs on the issue of liability.  Trooper Kiefer contends that he is entitled to qualified immunity because the undisputed facts show that his inquiries into the plaintiffs' immigration status were motivated by the plaintiffs' difficulties speaking and understanding English, which he contends is a legitimate race-neutral reason for the investigative steps taken.

### 1.  Constitutional Violation

In assessing Trooper Kiefer's claim of qualified immunity, we first determine whether the facts, viewed in the light most favorable to the plaintiffs, show a violation of the plaintiffs' constitutional rights.  *Dickerson*, 101 F.3d at 1158.  The plaintiffs allege that Trooper Kiefer singled them out for inquiry into their immigration status on the basis of their Hispanic appearance during the course of a lawful traffic stop.  The plaintiffs do not challenge the validity of their initial stop for a faulty headlight.  Nor do they assert that the questioning exceeded the permissible scope of the stop under the Fourth Amendment.  Nevertheless, as this court has recognized, "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th

plaintiffs' immigration status; namely, their difficulties in speaking and understanding English.

He also moved for summary judgment on plaintiffs' Fourth Amendment claim, asserting that he seized their green cards when they responded to his question as to where they got the green cards with the response that they paid for them.  This led him to the conclusion they were obtained illegally.  The possession of illegal identification is a crime under Ohio law.  He also asserts this is a race neutral reason for their seizure.

While it is unclear whether the court rejects the inability to speak English as race neutral, if it does then it should affirm the summary judgment for plaintiffs since it is the race neutral basis relied on by Kiefer for his inquiry.

The majority, while not rejecting the inability to speak and understand English as a race neutral reason, declines to apply our decision in *United States v. Travis*, 62 F.3d 170 (6th Cir. 1995), *cert. denied,* 516 U.S. 1060, in which we acknowledged that "consensual searches may violate the Equal Protection clause when they are initiated solely based on racial considerations."  *Travis* placed the burden on plaintiffs to show that no race neutral motives played a role in the challenged police conduct.  *Travis*, 62 F.3d at 173-74 (explaining that when officers "decide to interview a suspect for many reasons, some of which are legitimate and some of which [are] based on race . . . the use of race in the pre-contact stage does not give rise to any constitutional protections.").  While *Travis* deals with an equal protection challenge to consensual police interviews of airport travelers, and here we are dealing with questions to persons whose continued detention is because there is probable cause to believe they are transporting illegal drugs, the inquiry here, if anything, is less intrusive -- a mere request to see another item of identification rather than a consensual search.

Further, it is an inquiry which must be made were the officers to arrest plaintiffs since the arrest of an alien requires

---

**DISSENT**

---

KENNEDY, Cicuit Judge, dissenting.  This appeal deals only with officer Kiefer's individual liability to plaintiffs Esparza and Aquilar for events that occurred after a traffic stop for a burned-out headlight.  Thus, while the plaintiffs' claims are made as a part of a class action, Kiefer is liable to plaintiffs only for his acts in this incident.

Plaintiffs do not question the legitimacy of the initial traffic stop.  They do not claim they were stoppped because of their race.  Nor do plaintiffs challenge the propriety of the drug search of their vehicle.  The inquiry as to their immigration status and green cards did not arise until after a drug dog had alerted to their vehicle.  At that time, plaintiff Aquilar was in defendant's cruiser where Kiefer was checking Aquilar's Illinois driver license and registration.  After the dog alert, a second officer asked passenger Esparza, who was still in Aquilar's vehicle, for her identification and brought her to Kiefer's cruiser.  Thereafter, Kiefer asked plaintiffs for Aquilar's green card and where they had gotten their green cards.  The facts are in dispute as to just what plaintiffs said.  Both plaintiffs spoke very little English.  Defendant states that plaintiffs said they paid for their green cards.  Plaintiffs state they said they paid all the necessary fees for their green cards.  The district court appears to have accepted the defendant's version of what was said.  For plaintiffs' equal protection claim, it makes little difference since the discrimination they complain of is the inquiry about their immigration status -- "that Officer Kiefer targeted them for investigation regarding their immigration status solely on the basis of their being Hispanic."

Kiefer moved for summary judgment on plaintiffs' equal protection claim on the ground that the undisputed facts show that he had a racially neutral reason for inquiring about

Cir. 1997).  Similarly, the Supreme Court, in *Whren v. United States*, confirmed that an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment:

> We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race.  But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.  Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. 806, 813 (1996).  Therefore, if the plaintiffs can show that they were subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause.  *Cf. United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir.) (en banc) (holding that equal protection principles precluded use of Hispanic appearance as a relevant factor for Fourth Amendment individualized suspicion requirement), *cert. denied*, 531 U.S. 889 (2000).

The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by a discriminatory purpose."[4]  *Wayte v. United States*, 470 U.S.

---

[4] We note that the record contains no indication that the OSHP employs explicit racial criteria or admits to racially-motivated decision making.  If such a showing could be made, the plaintiffs would not need to establish the existence of a similarly situated class that was not investigated.  *See Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) ("[I]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an

598, 608 (1985). "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which "address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001). Discriminatory purpose can be shown by demonstrating that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Wayte*, 470 U.S. at 610 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

---

express, racial classification."), *cert. denied*, 122 S. Ct. 44 (2001); *cf. United States v. Ovalle*, 136 F.3d 1092, 1104-05 (6th Cir. 1998) (holding that it is unnecessary for criminal defendant to establish three-prong test for discrimination in grand jury selection where there is direct evidence of exclusion based upon race). "In its more recent pronouncements on laws based on racial classifications, the Supreme Court has started 'from the premise that [l]aws that explicitly distinguish between individuals on racial grounds fall within the core of [the Equal Protection Clause's] prohibition.'" *Ovalle*, 136 F.3d at 1105 (quoting *Miller v. Johnson*, 515 U.S. 900, 905 (1995)). Where the state adopts explicit racial criteria, strict scrutiny will automatically be applied, even in the absence of evidence of discriminatory purpose. *Wayte*, 470 U.S. at 610 n.10; *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("When racial classifications are explicit, no inquiry into legislative purpose is necessary.").

motion for summary judgment on the issue of Fourth Amendment liability.

In sum, we conclude that the undisputed facts reveal that Trooper Kiefer violated the plaintiffs' clearly established rights by detaining their green cards for over four days without probable cause. We therefore affirm the district court's denial of summary judgment to defendant Kiefer, as well as the district court's decision granting partial summary judgment to the plaintiffs.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of Trooper Kiefer's motion for summary judgment as to his defense of qualified immunity. Furthermore, we **AFFIRM** the district court's grant of partial summary judgment to plaintiffs on the issue of Fourth Amendment liability and **REMAND** for further proceedings consistent with this opinion.

the facts found by the District Court."[13]  Appellant's Br. at 5. A review of the record confirms that the parties are in complete agreement as to the underlying facts relating to the seizure and detention of plaintiffs' green cards.  Having determined that these facts show a violation of the Fourth Amendment, there is nothing left for us to resolve concerning the district court's grant of summary judgment to the plaintiffs on the issue of liability.  Thus, in the instant case, as in *Brennan*, "the issues of liability and qualified immunity are so related to each other that we can dispose of them together under the doctrine of pendent appellate jurisdiction."  *Id.* at 1157.

Our decision here is compelled by the interests of judicial efficiency underlying the pendent appellate jurisdiction doctrine. *See id.* at 1158.  A subsequent appeal of the district court's partial grant of summary judgment following a trial to determine damages would only waste judicial resources.  Any future appeal of the liability issue would be decided based upon the same record that is before us.  We see little benefit, therefore, in postponing judgment on this question.  Consequently, we exercise our pendent appellate jurisdiction and affirm the district court's decision granting the plaintiffs'

---

[13]We emphasize that this is not a case in which the defendant concedes to the plaintiff's view of the facts for the purposes of appeal only.  We recognize that after *Johnson*, 515 U.S. at 313, a defendant seeking interlocutory appeal of a denial of qualified immunity generally is well served to assume the correctness of the plaintiff's version of the facts for the purposes of appeal in order limit the appeal to the purely legal issue of qualified immunity.  Such a limited concession obviously would not bind the defendant to the plaintiff's account of the facts.  But this case is different; Trooper Kiefer did not merely assume the plaintiffs' version of the facts to be true for the purposes of appeal.  The record makes clear that there is no dispute between the parties as to the material facts relating to the seizure and detention of the plaintiffs' green cards.  Our decision to exercise our pendent appellate jurisdiction, therefore, is limited to the unique circumstances presented when, as here, the record clearly demonstrates that the *only* issue in dispute between the parties is the legal question of whether an officer's admitted conduct violates the Constitution.

This framework has been applied in a number of cases in this and other circuits involving allegations of discriminatory police enforcement practices.  *See, e.g*, *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) (applying selective enforcement test to criminal defendant's claim that officer tended to escalate traffic stops of young black males into drug investigations); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir.) (holding that defendant was required to demonstrate discriminatory effect to sustain defense based upon theory that police enforced bicycle headlight law only against black offenders), *cert. denied*, 519 U.S. 955 (1996); *United States v. Anderson*, 923 F.2d 450, 453-54 (6th Cir.) (applying selective prosecution framework to defendant's claim that he was singled out by the police for a background check for prior felonies following his arrest), *cert. denied*, 499 U.S. 980, and 500 U.S. 936 (1991).  Many of these cases involved § 1983 equal protection claims similar to those presented by the plaintiffs in the instant case.  *See Chavez*, 251 F.3d at 635-36 (applying discriminatory purpose/discriminatory effect test in class action suit alleging that state police used racial classifications in deciding whom to stop, detain, and search in enforcing traffic laws); *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (applying selective prosecution test to § 1983 claim alleging that police made racially motivated decision to pursue theft investigation against interracial couple); *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (applying selective prosecution test to § 1983 claim alleging that police arrested plaintiff because they believed she was a lesbian), *cert. denied*, 523 U.S. 1118 (1998).

In its April 20, 2000, order, the district court determined that the plaintiffs had presented sufficient evidence to prove the requisite facts for a prima facie case of intentional discrimination under the selective prosecution framework. J.A. at 239 ("I find that plaintiffs have satisfied their prima facie burden . . . .").  After reviewing the record, the district court initially determined that plaintiffs had advanced sufficient evidence to support a factual finding that "'the

decision makers in [their] case acted with discriminatory purpose.'" J.A. at 238 (quoting *McClesky v. Kemp*, 481 U.S. 279, 292 (1987)). The court noted that the record contained a range of circumstantial evidence supporting such a finding of intent. Perhaps most significantly, the court cited the deposition testimony of Kiefer and other OSHP officials:

> Trooper Kiefer . . . testified that when he found Hispanic passengers hiding under a blanket, he called the Border Patrol, but that if he found white people hiding under a blanket, he would not. Sgt. Elling likewise testified that he would not call the Border Patrol regarding a motorist []unless ["][he] would think that they would probably be Hispanic in nature." And Trooper Pahl admitted that she once had contacted the Border Patrol after coming across two Hispanic men whose car had broken down, but that she wouldn't do the same for a white man.

J.A. at 242 (citations omitted). The court also cited additional circumstantial evidence of discriminatory intent. The court noted that over ninety percent of OSHP's immigration inquiries concerned Hispanic motorists. The court also appears to have credited plaintiffs' argument that "[g]iven defendants' admitted lack of training in the identification of illegal immigrants, the only reasoned basis on which to question a motorist about immigration status . . . is the motorist's Hispanic appearance coupled with indicators of Hispanic ethnicity." J.A. at 240-41. The district court also observed that "TDIT provides officers with a list of immigration related questions along with their Spanish translations, but there is no evidence that such translations are provided in any other languages." J.A. at 241. Finally, the court discussed a videotape of a traffic stop in which Trooper Kiefer pulled over a car containing three Hispanic individuals for "driving slightly above the speed limit." J.A. at 242. During the stop, Kiefer questioned the driver and two passengers about their immigration status even after the individuals presented valid state identification cards and after Kiefer had decided not to issue a speeding citation. The court

entitled to summary judgment. *Id.* at 1158. We observed that the exercise of pendent appellate jurisdiction under such circumstances best served "the interest of judicial economy," since any further proceedings on the plaintiff's claim would be a waste of judicial resources once it was determined that he could not show a constitutional violation. *Id.*

Guided by the foregoing principles, we think it is appropriate to exercise our pendent appellate jurisdiction to address the district court's grant of partial summary judgment to the plaintiffs on the issue of Fourth Amendment liability. In reviewing the issue of qualified immunity, we have determined that the agreed-upon facts of the instant case demonstrate that Trooper Kiefer violated the plaintiffs' Fourth Amendment rights by detaining their green cards for four days without probable cause. Where, as here, the parties do not dispute the underlying facts, this determination necessarily subsumes the merits of the plaintiffs' constitutional claim.[12] In his brief, Trooper Kiefer admits that he "does not dispute

---

[12]The dissent argues that a factual dispute still exists as to whether the plaintiffs told Trooper Kiefer that they had paid for the green cards or only that they had paid the necessary fees. Our review of the record, however, reveals that all parties agree on the substance of the conversation between Trooper Kiefer and the plaintiffs. There is no dispute that Trooper Kiefer asked the plaintiffs whether they had paid for their green cards or that the plaintiffs answered in the affirmative. The plaintiffs contend that they *meant* that they had paid the necessary fees; but they have never claimed that they specifically answered Kiefer's question by saying that they had only paid for processing fees. The only remaining question then is the legal question of whether this exchange gave rise to mere reasonable suspicion or to something more. The district court concluded that the plaintiffs' answers gave rise to no more than reasonable suspicion, given the plaintiffs' obvious difficulty understanding Kiefer's questions. Trooper Kiefer does not dispute this conclusion. Consequently, we disagree with the dissent's assertion that material disputes of fact remain with respect to this issue.

of the district court's grant of partial summary judgment to the plaintiffs on their Fourth Amendment claims.

Under the doctrine of pendent appellate jurisdiction, however, a court of appeals may, in its discretion, "exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir.), *cert. denied*, 525 U.S. 964 (1998); *see also Brennan*, 78 F.3d at 1157. "We have interpreted 'inextricably intertwined' to mean coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *Hadix v. Johnson*, 228 F.3d 662, 669 (6th Cir. 2000) (quotation omitted). In *Brennan*, we applied the pendent appellate jurisdiction doctrine in circumstances analogous to those presented here. In that case, the plaintiff brought a § 1983 claim against the city and individual city officials claiming that he unconstitutionally was detained for twenty-two hours without an arraignment. The district court denied the individual defendants' motion for summary judgment based upon qualified immunity. Finding no genuine dispute of fact concerning this claim, the district court also granted partial summary judgment to the plaintiff on the issue of liability. *Brennan*, 78 F.3d at 1154. We reversed after concluding that the facts, even when viewed in the light most favorable to the plaintiff, did not establish a violation of the plaintiff's constitutional rights. *Id.* at 1156. We went on to review the district court's partial grant of summary judgment to the plaintiff against the city. We noted that, although partial summary judgment is not a final decision subject to review, "[t]his case presents a special situation . . . in which the issues of liability and qualified immunity are so related to each other that we can dispose of them together under the doctrine of pendent appellate jurisdiction." *Id.* at 1157. We concluded that pendent appellate jurisdiction was appropriate because our determination that the plaintiff had not alleged facts showing a constitutional violation "necessarily and unavoidably decide[d]" the issue of whether the plaintiff was

appears to have accepted plaintiffs' characterization of the tape as supporting an inference that the individuals in the vehicle "were questioned about their immigration status solely on the basis of their Hispanic appearance, because nothing about their conduct suggested that they were in the country illegally; indeed, Trooper Kiefer had been prepared to release [the driver] so long as [his] license cleared." J.A. at 243.

As to the discriminatory effect prong, the district court observed that "[t]he burden rests on plaintiffs to show, by a preponderance of the evidence, that they were treated differently than similarly situated non-minorities." J.A. at 238. The court considered, and rejected, defendants' argument that "no evidence presented thus far indicates that Hispanic motorists are treated differently than non-Hispanic motorists." J.A. at 243. The court concluded that plaintiffs' evidence was sufficient to permit a finding that smilarly situated non-Hispanic motorists were treated differently, observing that

> Plaintiffs have introduced direct evidence that Hispanic motorists are treated differently than white motorists. Trooper Kiefer, Sgt. Elling, and Trooper Pahl all testified that, in their experience, they would refer Hispanic motorists to the Border Patrol when, in precisely the same circumstances, they would not refer someone who was white (i.e., not of Hispanic appearance).

J.A. at 243-44. The district court noted that this finding was supported by additional "inferential evidence of a discriminatory practice," including the fact that "most motorists . . . [who were] asked about their green cards were Hispanic-looking" and defendants' misinformation and lack of training concerning what facts give rise to reasonable suspicion of immigration violations. J.A. at 244.

Because this is an interlocutory appeal, we do not consider whether the plaintiffs' evidence is sufficient to present a

genuine issue for trial as to the underlying factual elements of their selective enforcement claim — i.e., whether plaintiffs' evidence could support a finding that Trooper Kiefer actually did target the plaintiffs in part because of their Hispanic appearance or that the OSHP does not investigate non-Hispanic motorists who are similarly situated to the plaintiffs.[5]   Under *Johnson*, 515 U.S. at 317, we lack jurisdiction on interlocutory appeal of a denial of qualified immunity to review the district court's determination that plaintiffs have presented sufficient evidence to prove the underlying or basic facts alleged in support of their constitutional claim. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc) (observing that appellate court lacked jurisdiction to consider factual questions relating to defendants' knowledge and conduct).   Questions of evidentiary sufficiency are not separate and distinct from the merits of plaintiffs claims, and review of such questions on interlocutory appeal "can consume inordinate amounts of

---

[5]Since we decline to address the sufficiency of the plaintiffs' evidence to show the underlying factual elements of a selective enforcement claim, we likewise do not consider the propriety of the district court's partial grant of summary judgment to the plaintiffs on the issue of Fourteenth Amendment liability.  We note, however, that even a cursory review of the record reveals, for example, that Kiefer and other OSHP officials deny selecting motorists for immigration interviews based upon Hispanic appearance.  If a trier of fact believed this testimony, it would negate the intent element of plaintiffs' equal protection claim.  The record contains other factual disputes as well.  For example, Kiefer maintains in his deposition that only about half of the motorists he questions concerning immigration violations are Hispanic, which conflicts with the district court's determination that nearly all immigration investigations are initiated against Hispanic motorists.  It seems apparent, therefore, that the record is not as one-sided as the district court believed.  Thus, although we are without jurisdiction to review the court's grant of summary judgment to the plaintiffs on the Fourteenth Amendment issue, we do think the grant of summary judgment likely was premature, and we suggest that the district court reconsider this decision on remand.  In any event, the defendant remains free to challenge the grant of summary judgment on the Fourteenth Amendment claim following a final order from the district court.

---

In sum, we conclude that the agreed-upon facts of this case reveal that the four-day detention of the plaintiffs' green cards based upon less than probable cause was unreasonable. Therefore, we determine that the district court properly denied Trooper Kiefer's motion for summary judgment based upon his claim of qualified immunity.[11]

### 3.  The Grant of Summary Judgment to the Plaintiffs

Ordinarily, we would conclude our review after determining whether the defendant was entitled to qualified immunity, and we would decline to address the district court's grant of partial summary judgment to the plaintiffs. This is an interlocutory appeal.   As explained above, we have jurisdiction to hear the instant appeal because a denial of summary judgment based on "the legal question of qualified immunity" is an immediately appealable order under the "collateral order" doctrine. *Mattox*, 183 F.3d at 519.  In contrast, "a partial summary judgment on the issue of liability alone is not a 'final decision' under 28 U.S.C. § 1291," nor does such an order qualify as an immediately appealable collateral order. *Brennan v. Township of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996).   Therefore, we would not normally have jurisdiction to consider an interlocutory appeal

---

[11]Judge Kennedy's dissent voices concerns about a ruling by the district court, which allegedly held that Trooper Kiefer was required to provide the plaintiffs with a lawful substitute for their green cards.  We are unable to locate any such ruling in the record.  In its September 8, 1999, order granting summary judgment to the plaintiffs on their Fourth Amendment claims, the district court dissolved a preliminary injunction in which the court had ordered OSHP officers to issue substitute documents when they seize green cards known to be valid.  We are not aware of any order reinstating that injunction.  Furthermore, even if such an order existed, the issue is not relevant to the instant appeal.  The only issues before us are the specific constitutional claims of plaintiffs Aguilar and Esparza against Trooper Kiefer.  In its September 8, 1999, order, the district court explained that its previous ruling concerning the necessity of issuing lawful substitutes did not apply to the claims of Aguilar and Esparza, because they made "no allegation that OSHP troopers seized green cards known to be valid."  J.A. at 206.

*Id*. at 351 n.6.   Were we to accept the defendant's interpretation of *Fox*, law enforcement officers would be able to detain indefinitely an individual's property based upon reasonable suspicion alone.  Such an interpretation is wholly inconsistent with the Supreme Court's clear instruction that courts look to the duration of investigative detentions of personal property to determine whether such detentions are sufficiently "minimally intrusive" to be permissible based upon reasonable suspicion falling short of probable cause. *Place*, 462 U.S. at 709.

We also find unpersuasive the defendant's contention that the concept of a "continuing seizure" was rejected by the Supreme Court in *California v. Hodari D*., 499 U.S. 621, 625 (1991).  *Hodari D*. merely explained that if a suspect flees after an initial seizure, the seizure does not continue throughout the subsequent pursuit.  *See id.* ("To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a c*ontinuing* arrest during the period of fugitivity." (emphasis in original)).  *Hodari D*. addresses situations where physical control over a suspect is established, and then lost.  It does not stand for the proposition that a seizure ends at the instant that physical control is initially established, no matter how long a government official retains physical control of the suspect thereafter.

## 2.  Whether the Relevant Law Was Clearly Established

We further conclude that the rights asserted by the plaintiffs were clearly established at the time of the challenged detention.  *United States v. Place*, upon which the plaintiffs' claims rely, was decided in 1983, twelve years before the events in question.  We think that case was sufficient to put a reasonable officer on notice that the seizure for four days of important personal effects from a traveler on the public roads would violate the Fourth Amendment if based upon less than probable cause.

appellate time" by requiring the appeals court to comb a voluminous pretrial record to assess plaintiffs' evidence. *Johnson*, 515 U.S. at 316.  This limitation on our appellate jurisdiction applies with particular force to evidence sufficiency questions relating to a defendant's intent, such as whether a defendant acted with a discriminatory purpose. *See id.*; *McCloud v. Testa*, 97 F.3d 1536, 1544-45 (6th Cir. 1997) ("[T]he example that the *Johnson* Court chose to illustrate what kinds of cases it wanted to prevent the courts of appeals from exercising jurisdiction over focused on intent . . . ."). "[T]o determine whether there is or is not a triable issue of fact about such a matter [as the defendant's intent] may require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials.  This fact means, compared with *Mitchell*, greater delay." *Johnson*, 515 U.S. at 316.  Thus, our review in the instant case is confined to the question of whether "all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).  The district court concluded that the plaintiffs had presented sufficient evidence from which a trier of fact could find that the defendants, including defendant Kiefer, acted with a discriminatory purpose and did not initiate immigration investigations of non-Hispanic motorists who were otherwise similarly situated to the plaintiffs.  We therefore assume, without deciding, for the purposes of this appeal that the plaintiffs can prove these underlying factual claims. *Johnson*, 515 U.S. at 319 ("[T]he court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment . . . .").

Perhaps realizing this limitation on the range of issues appealable on interlocutory appeal, defendant Kiefer does not dispute that the plaintiffs have made a prima facie showing of discriminatory effect and discriminatory purpose.  Instead, Kiefer properly limits his appeal to "neat abstract issues of law" relating to qualified immunity — i.e., whether the facts

alleged by the plaintiffs demonstrate a violation of clearly established law. *Id.* at 317 (quotation omitted). Kiefer first argues that, assuming plaintiffs have shown that he targeted them for investigation in part because of their Hispanic appearance, the facts alleged by the plaintiffs do not demonstrate that he targeted them *solely* because of their apparent ethnicity. Kiefer argues that the undisputed facts reveal that he was motivated at least in part by plaintiffs' inability to speak English, which he alleges to be a valid race-neutral basis for initiating an immigration investigation.[6]

Kiefer relies on our opinion in *United States v. Travis*, 62 F.3d 170 (6th Cir. 1995), *cert. denied*, 516 U.S. 1060 (1996), for the proposition that a civil-profiling plaintiff must prove that he or she was targeted solely because of his or her race. In *Travis*, this circuit held that "consensual searches may violate the Equal Protection Clause when they are initiated solely based on racial considerations." *Id.* at 173. The legal standard articulated in *Travis* does appear to place the burden on the plaintiff to show that no race-neutral motives played a

---

[6]The defendant also asserts in his reply brief that the alert of the drug-sniffing dog provided a race-neutral reason to inquire into immigration status and inspect resident alien cards. We think this argument is without merit. Lieutenant Healy of the TDIT admitted the presence of narcotics bears no rational relation to the likelihood that the drivers are illegal immigrants, and the defendant concedes this point in his reply brief. Appellant's Reply Br. at 3. Instead, the defendant contends that because the Vienna Convention requires foreign nationals to be informed of their right to communicate with a consular officer of their home country if they are arrested or imprisoned, the defendant had a racially-neutral reason to inquire into the plaintiffs' immigration status — namely, to determine whether information consistent with the Vienna Convention needed to be given. This argument appears to have been raised for the first time in the defendant's reply brief on appeal, and it is not supported by any evidence in the record, so we decline to consider it. The defendant points to no evidence in the record to show that it is the practice of the OSHP to provide such information to arrested foreign nationals. Nor is there any evidence in the record that Trooper Kiefer considered the requirements of the Vienna Convention when deciding whether to pursue an investigation of the plaintiffs' immigration status.

The defendant's reliance on *Fox* in the instant case is misplaced. Unlike the plaintiff in *Fox*, the plaintiffs in the instant case have alleged facts showing that the *initial seizure* of their green cards was constitutionally defective because it exceeded the permissible scope of investigative detentions based upon less than probable cause. The *Fox* case did not consider the central issue presented in the instant case — namely, the permissible scope of a *Terry* seizure of an individual's personal effects. As explained above, this is an inherently time-sensitive inquiry. In *Fox*, the initial seizure resulted from a valid inventory search of the plaintiff's truck, which had been impounded after his arrest; it was not a *Terry* seizure based upon reasonable suspicion only. Moreover, the plaintiff in *Fox* conceded the constitutionality of the county's detention of his license for the four months that preceded his request for its return. It is hardly surprising, therefore, that the *Fox* court concluded that the county's continued detention of the license beyond that time did not "change[] the character of the [original] seizure from a reasonable one to an unreasonable one." *Id.* at 350. In contrast, we have concluded that Trooper Kiefer's four-day delay transformed the character of the seizure from a relatively brief investigative detention, which could be justified by mere reasonable suspicion, to a full-blown seizure requiring probable cause. The *Fox* court distinguished *Place*, which more closely resembles the instant case, on precisely these grounds:

> The *Place* Court provided a framework for analyzing when law enforcement agents may hold someone's property for a very short time on less than probable cause to pursue a limited course of investigation. The instant case involves an alleged "seizure" that occurred well after the point in time where *Place* is directly relevant. The plaintiff here is not challenging any action of the defendants until over four months after the plaintiff's license was removed from a vehicle pursuant to an inventory search, inventoried, and stored.

nature of the seizure was exacerbated by the undisputed fact that Trooper Kiefer "did not make clear to the plaintiffs how long the documents would be held or when or how he would return them to plaintiffs if they proved authentic."[10]   J.A. at 210 (Sep. 8, 1999, Order at 14); *accord Place*, 462 U.S. at 710 (pointing to similar facts in finding detention of luggage unreasonable).

   Contrary to Trooper Kiefer's assertion, *Fox v. Van Oosterum*, 176 F.3d 342 (6th Cir. 1999), does not require a holding in his favor.  In *Fox*, the plaintiff brought a § 1983 action against county officials, alleging that they acted unreasonably in refusing to return his driver's license, which had been seized during a valid inventory search of the plaintiff's truck.  *Id.* at 345.  The plaintiff in *Fox* never challenged the initial seizure of his license.  Rather, he contended that an unreasonable seizure occurred when county officials refused his request, four months after the initial seizure, that the license be returned.  *Id.* at 349.  We concluded that the challenged action — the refusal to return the license — was not a "seizure" for the purposes of the Fourth Amendment, because the seizure had been completed long before the date of his request.  *Id.* at 350.  The court explained that "'a seizure of property . . . occurs when there is some meaningful interference with an individual's possessory interests in . . . property,'" and that the seizure of the plaintiff's driver's license ended once the act of taking his property was complete.  *Id.* at 350 (quoting *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) (additional quotation omitted)).  Once the county officials had seized and stored the license for a number of months, the plaintiff had already been completely dispossessed of his possessory interests in the license, and the seizure was complete.

---

[10]We note that we do not mean to suggest that Trooper Kiefer's failure to provide plaintiffs with this information constitutes a *per se* Fourth Amendment violation.  We simply hold that this factor enters into the totality of circumstances to be considered in deciding whether the seizure was more than minimally intrusive.

role in the challenged police conduct.  Specifically, the *Travis* court explained that where "officers . . . decide to interview a suspect for many reasons, some of which are legitimate and some of which [are] based on race[,] . . . . the use of race in the pre-contact stage does not give rise to any constitutional protections."  *Id.* at 174.

   Nevertheless, we think it would be inappropriate to apply *Travis* to the factual circumstances presented in the instant case.  *Travis* and its progeny, particularly *United States v. Avery*, 137 F.3d 343 (6th Cir. 1997), addressed equal protection challenges to *consensual* police interviews of airport travelers, which were allegedly initiated based upon racial criteria.  This circuit has never used the *Travis* standard in cases alleging racially discriminatory conduct by officers toward an individual who has already been detained, and who is therefore not free to leave and terminate the encounter at will.  As our earlier discussion of the relevant case law makes clear, this circuit and our fellow courts of appeals have consistently applied the selective enforcement framework of *Wayte* and *Armstrong* in cases involving non-consensual police encounters.  We see no reason to depart from this approach in the instant case.  The selective enforcement framework does not require a plaintiff to show that the defendant had *no* race-neutral reasons for the challenged enforcement decision.  Instead, it is enough to show that the challenged action was taken "at least *in part* 'because of' . . . its adverse effects upon an identifiable group.'"  *Wayte*, 470 U.S. at 610 (quoting *Feeney*, 442 U.S. at 279).

   The "sole motive" requirement announced in *Travis* is an anomaly in equal protection law, and should not be applied outside the narrow factual context of purely consensual encounters.  The only legal authority cited by the *Travis* court for its "sole motive" analysis was the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), a First Amendment retaliation case.  However, *Mt. Healthy* merely announced that the presence of an impermissible motive will not give rise

to a constitutional violation if the state can show that the challenged decision would have been made regardless of the improper motive. *Id.* at 286-87. *Mt. Healthy* does not limit constitutional liability to instances in which an impermissible purpose was the *sole* motive for an adverse action; it simply requires an inquiry into whether the impermissible motive was a "but for" cause of the challenged decision. The same multiple-motive analysis applies in the equal protection arena: proof that a decision was "motivated in part by a racially discriminatory purpose . . . . shift[s] to the [defendant] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *Howard v. Senkowski*, 986 F.2d 24, 30 (2d Cir. 1993) (applying *Mt. Healthy/Arlington Heights* multiple-motive analysis to claim of race-based use of peremptory strikes). Indeed, the Supreme Court has clearly explained that the Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. Thus, we believe that *Travis* is in fact inconsistent with the Supreme Court's approach in *Mt. Healthy* and other multiple-motive cases involving equal protection issues. For that reason, we decline to extend the standard articulated in *Travis* beyond the narrow factual situation addressed in that case.

Thus, even if Trooper Kiefer is correct that the record reveals that he possessed *some* race-neutral basis for initiating the investigation of the plaintiffs, this fact alone would not entitle him to summary judgment on qualified immunity as long as the plaintiffs can demonstrate that he was partly motivated by a discriminatory purpose. Of course, Trooper Kiefer can still argue, based upon *Mt. Healthy* and *Arlington Heights*, that his race-neutral reasons would have caused him to investigate the plaintiffs regardless of any discriminatory motive that may have existed. The question of whether Trooper Kiefer's allegedly discriminatory motive played a

without obtaining a receipt in return or miss his flight, forfeit his plane ticket, and remain stranded in foreign environs"), *cert. denied*, 513 U.S. 912 (1994). Although Aguilar and Esparza were traveling by car, and therefore may have had more flexibility in their itinerary than an air traveler who must catch a plane, we think this added flexibility was not so great as to permit a four-day disruption of their travel plans.

Moreover, the facts alleged by the plaintiffs sufficiently demonstrate that the length of the detention was excessive in light of "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685. Although we decline to set a definitive time limit, we agree with the district court that reasonable suspicion would permit Trooper Kiefer to detain the green cards no longer than until the following day, when they could be verified by the INS.[9] Trooper Kiefer has not articulated any reason why a longer detention would have been necessary. The undisputed facts indicate that the INS could be reached to verify the authenticity of the plaintiffs' green cards on the Monday following the initial stop. By waiting for four days to return the plaintiffs' green cards, Trooper Kiefer failed to "diligently pursue [his] investigation." *Place*, 462 U.S. at 709. The unreasonable

---

[9] Such a detention would still be considerably longer than the ninety-minute detention rejected in *Place*. It is unnecessary to consider whether *Place* imposes a shorter time limit on the challenged seizure, since Trooper Kiefer's detention of the plaintiffs' green cards was well in excess of the length of time the district court or we would approve.

The dissent argues that if the seizure of plaintiffs' green cards is controlled by *Place*, then the constitutional violation was complete as soon as the search of plaintiffs' vehicle was completed. For the purposes of the instant case, we think it is enough that the four-day length of detention at issue exceeded *any* acceptable time limit for a seizure based upon less than probable cause under these circumstances. We see no need to consider whether a shorter detention might also have violated the Fourth Amendment under *Place*. Both *Place* and *Sharpe* counsel against unnecessarily setting *per se* time limits on *Terry*-style seizures. We therefore decline to do so.

arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Id.* at 710.

Turning to the the instant case, we conclude that the facts presented by the plaintiffs are sufficient to show that Trooper Kiefer's four-day detention of the plaintiffs' green cards based upon mere reasonable suspicion was unreasonable in duration. Both the Supreme Court and this circuit have found property seizures of much shorter duration than the four days presented herein to be unreasonable when based upon less than probable cause. *See, e.g., Place,* 462 U.S. at 709 (holding ninety minutes excessive); *Saperstein,* 723 F.2d at 1233 (holding 13 ½ hour seizure of luggage at airport was unreasonable under standards for investigative detentions); *Sanders,* 719 F.2d at 887 (holding three to four hour detention of luggage unreasonable). As was the case in *Place* and in the cases from this circuit involving seizures of luggage from travelers, we think that Trooper Kiefer's seizure interfered with both the plaintiffs' possessory interests in the green cards and their liberty interests in continuing uninterrupted with their travels. The plaintiffs' green cards were seized from them while they were traveling from their home in Chicago to Toledo to visit relatives. Moreover, "'[g]reen cards' play a significant role in the daily lives of [lawful permanent resident aliens]." *Etuk v. Slattery,* 936 F.2d 1433, 1437 (2nd. Cir. 1991). Failure to carry one's green card on his or her person can subject a legal resident alien to criminal sanctions, 8 U.S.C. § 1304(e), and green cards are an essential means by which resident aliens can establish eligibility for employment and participation in federally funded programs. *See Etuk,* 936 F.2d at 1437 (discussing relevant statutory provisions). Given the importance of these documents, the challenged seizure undoubtedly subjected the plaintiffs to disruption of their travel plans in order to remain with the documents or arrange for their return. *Accord Place,* 462 U.S. at 708; *United States v. Baro,* 15 F.3d 563, 567 n.1 (6th Cir.) (holding that seizure of traveler's cash was "tantamount to a seizure of his person" where officer presented traveler with "a Hobson's choice: abandon more than $14,000 to a plain-clothed stranger

determinative role in the decision to investigate the plaintiffs, however, is a factual dispute best suited for resolution at trial.

Moreover, we disagree with Trooper Kiefer's contention that the plaintiffs' difficulty speaking English necessarily establishes a valid race-neutral basis for initiating an immigration investigation. Kiefer relies on *United States v. Ortiz,* 422 U.S. 891, 897 (1975), in which Supreme Court identified one's "inability to speak English" as one of many factors that may be taken into account in deciding whether there is probable cause to search a private vehicle for illegal aliens. According to Kiefer, *Ortiz* conclusively establishes that officers lawfully may select individuals for immigration investigations based upon their inability to speak English.

We think *Ortiz* provides little guidance in the instant case. *Ortiz* was a Fourth Amendment case involving automobile searches at a Border Patrol checkpoint less than 100 miles from the U.S.-Mexican border. The respondent in *Ortiz* did not raise a Fourteenth Amendment claim and the Court mentioned the use of one's English-speaking ability as a basis for selection only once in a laundry list of factors that might be used in deciding whether there is probable cause to refer an automobile for further inspection. *Id.* The *Ortiz* Court therefore had no occasion to consider fully the equal protection implications raised when motorists are targeted for immigration investigations on the basis of their lack of familiarity with the English language. Moreover, the Supreme Court has cautioned against extending the logic of border enforcement cases to situations remote from the border, where the government interest in immigration policing may be less compelling. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 564 n.17 (1976); *accord United States v. Brignoni-Ponce,* 422 U.S. 873, 881 (1975) (noting that in the Fourth Amendment context, certain practices may be permitted at the border in part "because of the importance of the governmental interest at stake . . . and the absence of practical alternatives for policing the border").

The Supreme Court did consider the equal protection implications of using language as a basis for selection in *Hernandez v. New York*, 500 U.S. 352 (1991). In *Hernandez*, the Court cautioned that when a government official uses as a criterion for decision a person's ability to speak a *particular* language that is closely associated with a specific ethnic group, that fact may "raise[] a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based" actions. *Id.* at 363. In *Hernandez*, a prosecutor struck several Hispanic individuals from a criminal defendant's petit jury. Among the reasons articulated by the prosecutor for the strikes was the fact that the jurors were bilingual in English and Spanish and might therefore not accept the interpreter's account of the testimony of some of the prosecution's key witnesses, who were Spanish-speaking. The trial court found that the criminal defendant had shown a prima facie case of race-based challenges, but concluded that the prosecutor's proffered reasons were legitimate. The Court approved the trial court's conclusion, explaining that the question of whether the prosecutor's explanation was genuine or mere pretext masking an intent to discriminate was a "pure issue of fact" that turned largely upon credibility assessments and demeanor observations. *Id.* at 364.

Considering *Ortiz* in light of *Hernandez*, we think that an officer's reliance upon a suspect's *inability to speak English* may be a proper race-neutral factor, but that fact questions as to pretext are necessarily present where an officer acts based upon the fact that a suspect speaks *Spanish* due to the close connection between the Spanish language and a specific ethnic community, such as the large migrant labor community in Northwest Ohio. In light of this principle, it may be that genuine issues of material fact exist as to whether Trooper Kiefer's reliance on plaintiffs' inability to speak English was a legitimate race-neutral reason or a mere pretext for discrimination. The district court concluded that plaintiffs' evidence permitted the inference that OSHP officers focus on motorists' English-speaking ability largely because it is an "indicator[] of Hispanic ethnicity." J.A. at 241. The district

seizures of property may be less intrusive than seizures of persons, but concluded that this is not the case when the police detain luggage in an airport traveler's immediate possession. The Court explained that "such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *Id.* Therefore, the Court found that the agents' seizure of the luggage should be subjected to the same standards of reasonableness that are applied to investigative detentions of the person. *Id.* at 709. Noting that "we have never approved a seizure of the person for the prolonged 90-minute period involved here," the Court concluded that it "[could] not do so on the facts presented by this case." *Id.* at 709-10.

Rather than adopt a per se time limitation for seizures based upon less than probable cause, however, the Supreme Court has consistently "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985); *see also Place*, 462 U.S. at 709-10. "Much as a 'bright-line rule' would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685; *see also Place*, 462 U.S. at 709 ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). Accordingly, the *Place* Court relied heavily upon the fact that the agents had advance notice of the defendant's arrival, and thus "had ample time to arrange for their additional investigation . . . and thereby could have minimized the intrusion on respondent's Fourth Amendment interests," but failed do so. *Place*, 462 U.S. at 709. The *Place* Court further observed that the Fourth Amendment "violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what

means reasonably available.'" (quotation omitted)). "Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Avery*, 137 F.3d at 349. In the instant case, the plaintiffs concede that Trooper Kiefer had reasonable suspicion to believe that their green cards were forged. They contend, however, that the seizure of their green cards exceeded the legitimate scope of a seizure of property based upon less than probable cause, because Trooper Kiefer detained the cards for four days before they were returned. We agree.

The Supreme Court has previously emphasized that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether [a] seizure [of personal property] is so minimally intrusive as to be justifiable on reasonable suspicion." *Place*, 462 U.S. at 709. In *Place*, DEA agents seized a traveler's suitcase in an airport based upon facts giving rise to a reasonable suspicion that the suitcase contained narcotics. When the traveler refused to consent to a search of his luggage, the agents decided to hold the luggage while they awaited the arrival of a drug-sniffing dog. The agents allowed the traveler to leave. After the agents had held the luggage for ninety minutes, the dog arrived and "alerted" that the luggage contained narcotics, thereby supplying probable cause for a search. *See id.* at 699-700. The Court concluded, however, that the ninety-minute detention of the luggage prior to establishing probable cause was unreasonable. The Court explained that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709. In reaching this conclusion, the Court "reject[ed] the Government's suggestion that the point at which probable cause for seizure of luggage from the person's presence becomes necessary is more distant than in the case of a *Terry* stop of the person himself." *Id.* at 708. The Court acknowledged that, in some circumstances,

court particularly emphasized the fact that "the TDIT provides officers with a list of immigration related questions in English along with their Spanish translations, but there is no evidence that such translations are provided in any other languages." J.A. at 241. In contrast, OSHP officers dispute that they question only Spanish-speaking motorists. *See* Elling Dep. at 35 (noting that OSHP has questioned Polish persons who spoke "broken English"). This appears to be a factual dispute best suited to resolution at trial, and therefore it is not a proper basis for granting summary judgment to the defendant on qualified immunity.

### 2. Whether the Relevant Law Was Clearly Established

Trooper Kiefer contends that, even if his actions did constitute a violation of the plaintiffs' constitutional rights, these rights were not clearly established at the time of the challenged encounter. In particular, the defendant argues that this circuit did not recognize the existence of the rights asserted by the plaintiffs until our decision in *Travis*, 62 F.3d 170, which was handed down in August of 1995, more than four months after the events in question.[7] As noted in the

---

[7] In his reply brief, Trooper Kiefer further suggests that *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), created uncertainty in the law as to whether it was appropriate to target individuals for immigration inquiries based in part upon their Hispanic appearance. The *Martinez-Fuerte* Court held that it was not a violation of the Fourth Amendment for officials at a fixed border checkpoint selectively to refer motorists to a secondary inspection area, "even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry." *Id.* at 563. We think this argument is unavailing to the defendant. *Martinez-Fuerte* was a Fourth Amendment case, not an Equal Protection case. The Court's decision in *Martinez-Fuerte* merely considered whether, for the purposes of the Fourth Amendment, the Border Patrol was required to articulate an individualized basis for suspicion beyond the motorists' apparent nationality to justify the stop. The Court's holding was based upon its conclusion that because the intrusion presented by the checkpoint stop was "sufficiently minimal[,] . . . no particularized reason need exist to justify it." *Id.* The Court did not consider whether, if the Border Patrol relied upon racial or ethnic classifications in making the stop, such actions

foregoing section, *Travis* held that the Equal Protection Clause prohibits a police officer from selecting an airport traveler for a consensual interview solely on the basis of the traveler's race. *Id.* at 174. The defendant points to our observation in *Travis* that we had addressed the issue of whether racially motivated consensual encounters could give rise to an equal protection claim "only once before in an unpublished opinion." *Id.* at 173 (citing *United States v. Jennings*, 1993 WL 5927 (6th Cir. Jan. 13, 1993)). Since the first published opinion on the issue was handed down after the events in question, the defendant argues, a reasonable officer would not have known that Trooper Kiefer's actions violated the plaintiffs' constitutional rights.

We disagree with the defendant's characterization of the state of the law in 1995. While *Travis* may have been the first case to reach the merits of such an equal protection claim, we expressly acknowledged in a 1992 en banc case, *United States v. Taylor*, that an equal protection claim could be based upon evidence that law enforcement officers targeted minorities for consensual interviews on the basis of race. 956 F.2d 572, 578-79 (6th Cir.) (en banc), *cert. denied*, 506 U.S. 952 (1992). The *Taylor* court explained:

A review of . . . the briefs and arguments of counsel before the trial court and initially before this court[]

---

would violate the Equal Protection Clause. Consideration of this issue was rendered unnecessary by the Court's conclusion that the Border Patrol had offered conclusive evidence "to refute any suggestion that the Border Patrol relies extensively on apparent Mexican ancestry standing alone in referring motorists to the secondary area." *Id.* at 563 n.16. The *Martinez-Fuerte* Court, moreover, limited its holding to the particular circumstance of a checkpoint at the Mexican border, and noted that "[d]ifferent considerations would arise if, for example, reliance were put on apparent Mexican ancestry at a checkpoint operated near the Canadian border." *Id.* at 564 n.17. Given that the challenged stop occurred near Toledo, Ohio, a location much closer to the Canadian border than to the Mexican border, we think *Martinez-Fuerte* offers little support for Trooper Kiefer's argument.

Trooper Kiefer does not challenge the district court's ruling that he did not possess probable cause to seize the plaintiffs' green cards.[8] The relevant question, therefore, is whether the seizure of the plaintiffs' green cards satisfied the standards for Fourth Amendment reasonableness applicable to seizures of personal property based upon less than probable cause.

Determining whether a seizure of personal property based upon less than probable cause is reasonable for the purposes of the Fourth Amendment involves a two-step inquiry. "First, the Court must determine whether the detaining officer has a reasonable and articulable suspicion that the property he wishes to seize is connected with criminal activity." *Sanders*, 719 F.2d at 887. Second, the scope of the seizure must be reasonable, both in duration and in intrusiveness. *Place*, 462 U.S. at 709; *Sanders*, 719 F.2d at 887 ("If there is reasonable suspicion, the Court must then ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used 'the least intrusive

---

[8] Judge Kennedy's dissent maintains that Trooper Kiefer did have probable cause to seize the green cards. The dissent points out that Trooper Kiefer argued that he had probable cause in the district court. Nevertheless, Kiefer did not renew that argument on appeal, and therefore has waived the argument. Nowhere in his opening brief or reply brief does Trooper Kiefer challenge the district court's determination that the facts gave rise to no more than reasonable suspicion that the green cards were forged. It is well established that an issue not raised in a party's briefs on appeal may be deemed waived. *See Ahlers*, 188 F.3d at 374. Although Trooper Kiefer does argue in his appellate briefs that the initial seizure of the green cards was valid, he bases this claim on the district court's conclusion that his seizure was supported by reasonable suspicion. On appeal, Trooper Kiefer's only argument is that once reasonable suspicion was established to justify the initial seizure, the Fourth Amendment placed no limits on the duration of the ensuing detention. If Trooper Kiefer desired to challenge this aspect of the district court's ruling, the instant appeal would have been the proper time to do so. The legal question of whether the undisputed facts demonstrate that Kiefer had probable cause to seize the plaintiffs' green cards is directly relevant to step one of the qualified immunity test, insofar as it relates to whether the plaintiffs have shown a constitutional violation under *Place*.

*Jacobson*, 466 U.S. 109, 120-21 (1984) (concluding that detention of package sent through private carrier was "seizure" subject to Fourth Amendment reasonableness requirement). In general, like seizures of the person, seizures of personal property require probable cause. As the Supreme Court has explained:

> In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.

*Place*, 462 U.S. at 701 (citations omitted). As is the case with brief investigative detentions of the person, *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court has recognized that some brief detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are "minimally intrusive." *Place*, 462 U.S. at 706 ("[S]ome brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime."); *see also United States v. Saperstein*, 723 F.2d 1221, 1231 (6th Cir. 1983) (explaining that "seizures of personal effects when based on anything less than probable cause" are permitted only to the extent that they satisfy the standards for reasonableness applicable to "*Terry*-type investigative detention[s]"); *United States v. Sanders*, 719 F.2d 882, 886 (6th Cir. 1983). In his brief on appeal,

disclosed no charge that the appellant . . . had been selected for a consensual interview because he was an African-American, that the law enforcement officers at the Memphis Airport implemented a general practice or pattern that primarily targeted minorities for consensual interviews, or that they had incorporated a racial component into the drug courier profile. *A factually supported record of such charged official conduct in the instant case would have given rise to due process and equal protection constitutional implications cognizable by this court.*

*Id.* (emphasis added). We think this statement demonstrates that, at least by 1992, it was clearly established that the Constitution prohibited racial targeting in law enforcement investigations, regardless of whether an encounter was lawful under the Fourth Amendment.

Moreover, even before *Taylor*, we had applied the selective enforcement framework to a criminal defendant's claim that he was improperly selected for a prior-felonies-background check after his arrest. *Anderson*, 923 F.2d at 453. The claim advanced in *Anderson* closely resembles the plaintiffs' claim in the instant case insofar as both claims involve allegedly discriminatory police motives for pursuing a particular course of investigation of a suspect who is already in police detention. Although we did not find a selective enforcement violation in *Anderson*, our discussion in that case left little doubt that we would have permitted the claim had the defendant been able to satisfy his burden under the Supreme Court's selective enforcement test. *Id.* (citing *Wayte*, 470 U.S. at 608 n.10, 609). We think *Anderson* demonstrates that any ambiguity in the law of selective enforcement before *Travis* was confined to the limited factual context of consensual police encounters. Since we have already determined that the consensual airport encounter cases are inapposite to the instant case, we conclude that any ambiguity in the law relating to consensual encounters before the *Travis*

opinion does not justify granting qualified immunity to Trooper Kiefer.

Furthermore, as we have already observed, for a right to be clearly established, "it need not be the case that 'the very action in question has been previously held unlawful.'" *Russo*, 953 F.2d at 1042 (quoting *Anderson*, 483 U.S. at 640). Rather, the pre-existing law must be such that existence of the right is apparent. *See id.* In this vein, we have recognized that "[i]t is a venerable rule under the Equal Protection Clause that the state may not choose to enforce even facially neutral laws differently against different portions of the citizenry solely out of an arbitrary desire to discriminate against one group." *Stemler*, 126 F.3d at 874; *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."). This principle has long been held to condemn selective prosecution of suspected offenders based upon their membership in a particular group. *See generally Wayte*, 470 U.S. 598. We conclude, therefore, that a reasonable officer at the time of the events in question would have known that the Constitution forbade embarking on an investigation of someone for a particular offense on the basis of that person's race.

In conclusion, we determine that the facts alleged by the plaintiffs would, if proved, establish that Kiefer violated their rights under the Equal Protection Clause by targeting them for immigration-related questioning on the basis of their race. Moreover, we think that the relevant legal principles controlling this case were clearly established at the time of the defendant's actions. We therefore conclude that the district court correctly denied Trooper Kiefer's motion for summary

judgment on his defense of qualified immunity with respect to the plaintiffs' equal protection claims.

## D. Detention of the Plaintiffs' Green Cards

Trooper Kiefer next appeals the district court's denial of his motion for summary judgment based on his qualified immunity defense to the plaintiffs' Fourth Amendment claim, which alleged that Kiefer's four-day detention of the plaintiffs' green cards was unreasonable. The court found that Trooper Kiefer's *initial* seizure of the plaintiffs' green cards was lawful, because the plaintiffs' confusing answers to Trooper Kiefer's questions about whether they had "paid for" the green cards gave rise to reasonable suspicion — but not probable cause to believe — that the cards had been forged. The court concluded, however, that Trooper Kiefer's failure to return the green cards changed the nature of the seizure from a brief investigative detention that could be based upon mere reasonable suspicion to a full seizure that could be justified only by probable cause. Because Trooper Kiefer did not have probable cause for such a seizure, the court concluded that his actions were unreasonable under the Fourth Amendment. The district court further determined that no material facts were in dispute regarding this claim, and consequently granted summary judgment to the plaintiffs. On appeal, Trooper Kiefer requests that we reverse the district court's denial of qualified immunity, or "[i]n the alternative, . . . dismiss Plaintiff's claims on the merits." Appellant's Br. at 19.

### 1. The Constitutional Violation

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The text of the Fourth Amendment therefore extends protection against unreasonable seizures of personal property, i.e., "papers[] and effects," as well as seizures of the person. *United States v. Place*, 462 U.S. 696, 700-01 (1983); *United States v.*